RUSS, AUGUST & KABAT
Larry C. Russ, State Bar No. 82768
lruss@raklaw.com
Nathan D. Meyer, State Bar No. 239850
nmeyer@raklaw.com
12424 Wilshire Boulevard, 12th Floor
Los Angeles, California  90025
Telephone:   (310) 826-7474
Facsimile:    (310) 826-6991

Attorneys for Defendants
Forever 21, Inc., Forever 21
Logistics, Inc., Forever 21
Retail, Inc., Jin Sook Chang,
and Do Won Chang

Levinson Arshonsky & Kurtz, LLP
Robert A. Levinson, State Bar No. 82300
Angie S. Lee, State Bar No. 254018
alee@laklawyers.com
15303 Ventura Blvd., Suite 1650
Sherman Oaks, CA 91403
Telephone:  (818) 382-3434
Facsimile:  (818) 382-3433

Attorneys for Defendant
Steps Apparel Group, Inc.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| EXPRESS LLC,<br><br>              Plaintiff,<br><br>        v.<br><br>FOREVER 21, INC.; FOREVER 21 LOGISTICS, INC.; FOREVER 21 RETAIL, INC.; JIN SOOK CHANG; DO WON CHANG; WHITE OWL CLOTHING, INC.; STEPS APPAREL GROUP, INC. dba STEPS OF CA; and DOES 1 through 10, inclusive,<br><br>              Defendants | Case No. CV09-04514 ODW (VBK)<br><br>**FOREVER 21 DEFENDANTS' AND STEPS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>**Hearing**<br>**Date: August 16, 2010**<br>**Time:1:30 p.m.**<br>**Courtroom: 11**<br><br>**Discovery Cut-off: July 5, 2010**<br>**Pre-Trial Conference: Sept. 13, 2010**<br>**Trial: Oct. 5, 2010**<br><br>Complaint Filed:<br>        June 23, 2009 |

RUSS, AUGUST & KABAT

# Table of Contents

**Page**

I.    INTRODUCTION ................................................................................. 1

II.   FACTUAL BACKGROUND ................................................................. 3

III.  EXPRESS CANNOT SHOW THAT IT OWNS AN ORIGINAL COPYRIGHT ........................................................................................ 3

    A.  The Facts Show No Originality. ..................................................... 4

    B.  Express Cannot Use the Fact that It Discarded Potentially Dispositive Evidence as a Sword against Forever 21 and Steps. ......... 6

    C.  Neither Forever 21 Nor Steps Disputes Access or Substantial Similarity. ...................................................................................... 8

IV.   EXPRESS DOES NOT HAVE ENOUGH EVIDENCE OF SECONDARY MEANING OR LIKELIHOOD OF CONFUSION TO SURVIVE SUMMARY JUDGMENT ON THE TRADE DRESS CLAIM ........................................................................................... 8

    A.  No Court Has Found Secondary Meaning Based on Copying, Absent Overwhelming Independent Evidence of Secondary Meaning. ...................................................................................... 9

        1.  Category I: Overwhelming Independent Evidence of Secondary Meaning Supports an Inference of Intent to Pass Off. .................................................................................... 9

        2.  Category II: Insufficient Independent Evidence of Secondary Meaning – Intentional Copying Never Found Sufficient to Save Plaintiff's Claim. ....................................... 11

        3.  The Relevant Intent, to the Extent Intent Is Relevant, Is Intent to Pass Off, not to Copy the Design. ............................. 14

    B.  Express's Has No Independent Evidence of Secondary Meaning. ...................................................................................... 15

    C.  Express Had Not Even Attempted To Prove That There Was Secondary Meaning At The Time Forever 21 and Steps Committed The Allegedly Infringing Acts. ..................................... 17

    D.  Express Cannot Show that the Purported Trade Dress is Non-Functional. .................................................................................. 18

V.    EXPRESS'S CANNOT SHOW LIKELIHOOD OF CONFUSION .......... 18

VI.   UNFAIR COMPETITION – EXPRESS HAS NOT PLEAD, AND CANNOT PLEAD, UNFAIR COMPETITION BASED ON THE SHORTS ............................................................................................ 22

VII.  THERE ARE DISPUTED ISSUES OF FACT REGARDING THE LIABILITY OF THE CHANGS ........................................................... 23

## Table of Contents Continued

| | **Page** |
|---|---|
| VIII. CONCLUSION | 25 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RUSS, AUGUST & KABAT

**FOREVER 21 DEFENDANTS' AND STEPS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

<u>**Table of Authorities**</u>

<u>**Page**</u>

**Cases**

*Adidas-Salomon Ag v. Target Corp.*
　228 F. Supp. 2d 1192 (D. Or. 2002) ..................................................... 9, 14

*Asics Corp. v. Skechers USA*
　2007 U.S. Dist. LEXIS 38048 (C.D.Cal. April 25, 2007) .............. 10, 14, 16

*Black & Decker Corp. v. Int'l Sales & Mktg.*
　36 U.S.P.Q.2d 1851 (C.D.Cal. 1995) .......................................................... 10

*Clicks Billiards, Inc. v. Sixshooters, Inc.*
　251 F.3d 1252 (9th Cir. 2001) ............................................................... 15, 16

*Continental Lab. Prods. v. Medax Int'l*
　114 F. Supp. 2d 992 (S.D.Cal. 2000) ..................................................... 11, 14

*Dastar Corp. v. Twentieth Century Fox Film Corp.*
　539 U.S. 23 *S. Ct. 2041, 2049(2003)* ........................................................ 23

*DCNL Inc. v. Almar Sales Co.*
　47 USPQ2d 1406 (N.D.Cal. 1997) ........................................................ 20, 21

*Dream Games of Arizona, Inc. v. PC Onsite*
　561 F.3d 983 (9th Cir. 2009) ...................................................................... 22

　22

*GoTo.com v. Walt Disney, Inc.*
　202 F.3d, 1199 (9th Cir. 2000) .................................................................... 21

*Green Bullion Fin. Servs., LLC v. Money4Gold Holdings, Inc.*
　639 F. Supp. 2d 1356 (S.D.Fla 2009) .......................................................... 17

*L.A. Gear, Inc. v. Thom McAn Shoe Co.*
　988 F.2d 1117 (Fed.Cir. 1993) ............................................................... 19, 21

*Lisa Frank, Inc. v. Impact Int'l, Inc.*
　799 F.Supp. 980 (D.Ariz. 1992) ............................................................ 10, 14

*Microsoft Corp. v. Image & Bus. Solutions, Inc.*
　2007 U.S. Dist. LEXIS 76519 at *6 (C.D. Cal. May 4, 2007) .................... 24

*North Coast Industries v. Jason Maxwell, Inc.*
　972 F.2d 1031 (9th Cir. 1992) ...................................................................... 7

*Perfumeebay.com Inc. v. eBay, Inc..*
　506 F.3d 1165 (9th Cir. 2007) ..................................................................... 21

*R. Ready Prods., Inc. v. Cantrell*
　85 F.Supp.2d 672 (S.D.Tex 2000) ................................................................ 6

*Seed Lighting Design Co. v. Home Depot*
　2005 U.S. Dist. LEXIS 44741 (N.D.Cal. August 3, 2005)..................... 13, 14

RUSS, AUGUST & KABAT

**FOREVER 21 DEFENDANTS' AND STEPS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

<u>**Table of Authorities Continued**</u>

<u>**Page**</u>

*Sivak v. Versen*
  2007 U.S. Dist. LEXIS 22430, *21-23 (S.D.Cal. March 27, 2007)............. 23

*Southern Bell Tel. & Tel. Co. v. Associated Tel. Directory Publishers*
  756 F.2d 801 (11th Cir. 1985) ................................................. 24

*Stormy Clime, Ltd. v. Progroup, Inc.*
  809 F.2d 971 (2d. Cir. 1987) .................................................. 20

*The Jewish Sephardic Yellow Pages, Ltd v. Dag Media, Inc.*
  478 F.Supp.2d 340 (S.D.N.Y. 2006) .......................................... 13

*Three Boys Music Corp. v. Bolton*
  212 F.3d 477 (9th Cir. 2000) ................................................... 8

*Vision Sports, Inc. v. Melville Corp.*
  888 F.2d 609 (9th Cir. 1989) ............................................ 10, 16

*Vogue Ring Creations, Inc. v. Hardman*
  410 F.Supp. 609 (D.R.I. 1976) ................................................. 6

*Walker & Zegner Inc. v. Paragon Indus.*
  549 F.Supp.2d 1168 (N.D.Cal. 2007) .............................. 13, 14, 16

Williams v. UMG Recordings
  *281 F. Supp. 2d 1177 (C.D.Cal. 2003)* ..................................... 23

*Yankee Candle Company, Inc. v. Bridgewater Candle Company, LLC*
  259 F.3d 25, 38 (1st Cir. 2001).................................... 13, 14, 17

RUSS, AUGUST & KABAT

**FOREVER 21 DEFENDANTS' AND STEPS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## I.     INTRODUCTION

Express's Motion For Summary Judgment seeks to turn copyright and trademark law on their heads, and replace such concepts as originality, secondary meaning and likelihood of confusion with the chilling and legally unsupportable claim that copying is *always* illegal.  In Express's world; (1) its designer can admittedly copy pre-existing plaids; (2) discard all of the evidence of the pre-existing plaids; (3) hide the copying from the Copyright Office while claiming an original work; (4) be unable to identify any differences between the final plaid and the pre-existing plaid; (5) be excused from demonstrating the differences were more than trivial; and (6) use the destruction of evidence and lack of memory as a sword against a defendant.  ***These facts are undisputed in the record***.

With respect to its trade dress claim, Forever 21 modified a common track jacket which sold in Express stores for barely four months.  Once again, in Express' world, copying alone is sufficient to establish the existence of trade dress rights and excuses a plaintiff from proving secondary meaning and likelihood of confusion.  If copying alone established secondary meaning, there would never be a need to look to any other indicia of secondary meaning, such as consumer surveys, extensive advertising, unsolicited press recognition or extensive sales over a long period of time.  In fact, no court has *ever* found that copying alone is sufficient to establish secondary meaning, and numerous courts have specifically held that copying is not sufficient.  Copying is relevant *only* where there is concrete evidence that a defendant has attempted to take advantage of or trade on the good will of another company and where good will actually exists.  If a product has not garnered consumer recognition, copying is of no moment.  *See Walker & Zegner, infra,* 549 F.Supp.2d at 1181*, Yankee Candle, infra,* 259 F.3d at 38.

Facing a dearth of helpful facts and overwhelming adverse legal authority, Express has resorted to mud slinging.  In Express's world, the specific facts of this

RUSS, AUGUST & KABAT

RUSS, AUGUST & KABAT

1  case and established legal precedent should be ignored.  Instead, Express asks the

2  Court to condemn Forever 21 for resolving lawsuits out of court.  Consistent with

3  the policy favoring the compromise and settlement of disputes,[1] these lawsuits

4  were settled because settlement cost less than litigation; the settlements were not

5  admissions of liability.  Express also relies heavily on Forever 21's receipt of cease

6  and desist letters over the years.  According to Express, on the basis of irrelevant,

7  inadmissible, hearsay evidence, the Court should conclude that Forever 21's

8  "business model" is somehow unlawful.  Express's attempt to taint the Court with

9  preposterous and irrelevant material is precisely what compelled Forever 21 to

10  change its strategy and defend this action to the end.  Enough is enough.[2]

11      Through its own motion, Express agrees that the material facts in this matter

12  are not in dispute and that this Court may dispose of this case via summary

13  judgment. As the Court will observe below (see section III.A, *infra*), Express

14  frequently mischaracterizes the deposition testimony of its own witnesses in an

15  attempt to alter the evidence. Where this has taken place, Forever 21 has taken

16  pains to quote the transcript for the Court's convenience and for reasons of

17  accuracy.  Express also mischaracterizes the principal cases it relies upon, and

18  completely ignores the more germane authorities cited by Forever 21 in its own

19  motion.   In light of the simple undisputed facts in *this case* and by analyzing the

20  authorities that have addressed similar fact patterns, Express's Motion For

21  Summary Judgment should be denied and Forever 21's motion should be granted.

---

[1] Fed R. Evid. 408, Notes of Advisory Committee on Rules.

[2] Perhaps most outrageous is Express' reliance on an out of context quote from Magistrate Dolinger in connection with a discovery dispute in an entirely unrelated case from three years ago.  The Magistrate's comments were not findings and the Magistrate did not rule on the case on the merits – the ruling was on a discovery motion.  The Magistrate made assumptions based upon the bald allegations of counsel in the context of a discovery dispute, as the facts had to be viewed in the light most favorable to the party seeking discovery.  The comments of a Magistrate in an entirely unrelated matter should have no place in the deliberations of the Court in this distinct matter.  *See* Objections to Evidence, filed concurrently.

## II.   FACTUAL BACKGROUND

On the merits of Express's claims for relief, Express's statement of facts treads essentially the same background as the facts stated in Forever 21's own motion for summary judgment.  Rather than repeat these statements, Forever 21 simply refers the Court to its own statement of facts in its motion, at Docket No. 104.  Where necessary in the brief, and of course in the Statement of Genuine Issues, Forever 21 has addressed specific facts as needed.

That said, Forever 21 must respond to Express's (completely predictable) attempt to denigrate its business practices.  As stated in more detail in Forever 21's own motion, Forever 21 respects valid intellectual property, and vigorously trains its buyers in intellectual property law.  SG 132.[3]  Forever 21 also employs dozens of its own designers to satisfy the growing demand for new fashions.  SG 133.  Forever 21's use of pre-existing designs and trends is consistent with industry practice going back at least eighty years (and Michael Tower's going back at least ten).  None of this is relevant to the key issues in this case, namely whether or not Express's plaid designs are original and whether the jacket has secondary meaning.

## III.   EXPRESS CANNOT SHOW THAT IT OWNS VALID COPYRIGHTS

Express argues that a registration certificate, combined with Express's destruction of evidence and its "designer's" bad memory, effectively foreclose a challenge to the originality of the Express Plaid Designs.  Express misstates both the law and the facts.  At best, the Express Plaid Designs are each derivative works, based on unknown changes from single source plaids that have been discarded by Express.  This fact has been withheld from the Copyright Office.

RUSS, AUGUST & KABAT

---

[3] Forever 21's Statement of Genuine Issues and Additional Material Facts ("SG") filed concurrently herewith.  Facts 1-91 are Express's facts, and the reference in the brief is to Defendants' response.  Facts 92-136 are additional facts added by Defendants.

2923-03 100726 Opp re MSJ.doc

3

**A.     The Facts Show No Originality.**

Express twists and ignores the deposition testimony of Michael Tower in its motion by jumping to the conclusion that the designs were all wholly original. Below is a brief explanation of the 'creation' of the plaids, in Mr. Tower's own words.

*First,* Mr. Tower would select a pre-existing plaid from the marketplace, either an actual garment, a photograph, or a fabric swatch:

> "It doesn't come in my head actually, I have a – whether it's a picture, whether it's a garment, whether it's a tear sheet, whether it's a photo. I start with something like that, basically." SG 8-9, 92.

Mr. Tower was particularly adamant that although he could not recall exactly what he used to create the Express Plaid Designs, it was a single work, not something inspired by a variety of plaids:

> "Q.  Do you remember what you showed the CAD designer. . . to create this particular plaid?
>
> A.  No.
>
> Q.  Okay, You don't remember whether it was a fabric swatch?
>
> A.  No.
>
> Q.  You don't remember whether it was an actual pair of shorts?
>
> A.  No.
>
> Q.  You don't remember if it was a photograph or something?
>
> A.  No.
>
> Q.  But do you remember that you did show him something?
>
> A.  Yes." SG 8-9, 93
>
> . . .
>
> Q.  And you also don't recall specifically where you got whatever it is that you showed him in connection with these four shorts?
>
> A.  No." *Id.*

RUSS, AUGUST & KABAT

4

RUSS, AUGUST & KABAT

1    *Second,* Mr. Tower showed that plaid to a CAD operator, Ed Field:

2    Q.  So you showed Ed something, but you don't remember what it

3    was?

4    A.  Yes."

5    Q.  And the Ed did a rendering on the CAD?

6    A.  Uh Huh.  SG 10, 94.

7    . . .

8    "Q: So he takes the pattern that you show him, and he basically

9    creates that on his CAD machine?

10    Yes." *Id.*

11    *Third,* the CAD operator would scan the plaid onto a computer using a

12    scanner:

13    Q: Do you know whether he had the ability to scan a photograph or

14    scan whatever it is you gave him to start with something on the CAD

15    device that he could play with?

16    . . .

17    A: He has a scanner." SG 10, 95.

18    *Fourth,* Mr. Tower testified he could not remember *any* specific changes

19    from the  source plaid:

20    Q.  Do you remember what specific changes you told Ed to make

21    from the original thing that you gave him, that you showed him?

22    . . .

23    A.  No.

24    Q.  So you don't remember any specific changes that you made?

25    A.  For this short, no."  SG 10-12, 96.

26    *Finally,* Express has been unable or unwilling to produce the source plaids

27    for the Express Plaid Designs. SG 97.

28

RUSS, AUGUST & KABAT

1    As quoted above, the Express Plaid Designs were not "inspired" by vague
2    pre-existing designs as a whole, but were copied.  Both Express and Forever 21
3    rely upon the undisputed testimony of Mr. Tower to establish the facts regarding
4    the creation of the Express Plaid Designs.  Express relies upon only a few lines of
5    testimony, and ignores the rest, while Defendants have no fear of relying upon all
6    of Mr. Tower's testimony.  Based on this undisputed testimony, and the fact that
7    Express failed to disclose these facts to the Copyright Office, Express cannot meet
8    its burden to establish originality as a matter of law. Express can only own a
9    copyright in whatever changes, if any, it made to the source plaids.  17 U.S.C.
10   103(b).  By destroying the evidence, Express has made determining the materiality
11   of the alleged changes impossible.

12   Failure to disclose the existence of these source works is grounds to
13   invalidate the copyrights absent correction.  *R. Ready Prods., Inc. v. Cantrell,* 85
14   F.Supp.2d 672, 692 (S.D.Tex 2000), "Plaintiffs failed to disclose in their
15   registration application that there were pre-existing mailers on which Plaintiffs'
16   works were substantially based . . . . Plaintiffs thus failed to inform the Copyright
17   Office of *crucially material* facts." (emphasis added).  *Vogue Ring Creations, Inc.*
18   *v. Hardman,* 410 F.Supp. 609, 615-16 (D.R.I. 1976) (the "unexplained omission"
19   of the fact that the ring was based on a nearly identical prior work sufficient to
20   support unclean hands and copyright invalidity defenses).  Here, there has been no
21   correction -- this undisputed fact supports the grant of summary judgment *against*
22   Express, as it did in *R. Ready*.

23   **B.    Express Cannot Use Its Destruction of Potentially**
24   **        Dispositive Evidence as a Sword.**

25   Express's destruction of evidence (albeit pre-litigation) cannot be held
26   against Forever 21.  Express's attacks on Forever 21 for its inability to find the
27   source plaids *that Express itself destroye*d are thus misplaced.  It is not Forever
28

21's burden to find a three-year-old needle in a world full of haystacks, particularly when Express is jealously guarding the most likely haystacks with a pitchfork of legal objections.

*North Coast Industries v. Jason Maxwell, Inc.*, 972 F.2d 1031 (9th Cir. 1992), cited by Express, illustrates this principle.   In *North Coast*, as here, plaintiff's design was derivative of a source work, in that case an Yves Saint-Laurent sketch and a Mondrian painting.   Unlike here, the plaintiff's testimony enabled the defendant to locate the source works.   The court compared the works to plaintiff's work, and the Ninth Circuit ruled that there was an issue of fact as to whether the differences were non-trivial.  *Id.* at 1034-35.

In *North Coast, the source works were sufficiently identified by plaintiff, such that the defendant could find them.*  Here, in contrast, the source designs have been discarded by Express, and Mr. Tower either will not or cannot remember what they were.  SG 10-12, 96.  The side-by-side comparison of the source and derivative works, so crucial to the analysis in *North Coast,* cannot be conducted here due to Express' acts.  Express's failure to preserve or identify the source work cannot be held against Forever 21.  Forever 21 cannot be expected to successfully scour the globe for the item that formed the basis (or possibly whole) of the Express Plaid Designs.

In short, Mr. Tower admits that he based the Express Plaid Designs on other source plaids.  SG 92-93.  He admits these designs were copied onto computer.  SG 96.  He admits that Express discarded all of the source plaids.  SG 97.  Mr. Tower admits that he cannot recall a single change he made to the source plaids, except that the colors selected were consistent with Express's color scheme for that season.  SG 96.  Notwithstanding these *undisputed* facts, Express argues that it is still entitled to a presumption that the copyrights are valid and that the plaids are original.  This is absurd.  If Express were correct, then the whole requirement of

7

RUSS, AUGUST & KABAT

originality would be vitiated and the Copyright Act rendered meaningless. Express's motion should be denied, and Defendants' granted.

### C.   Neither Forever 21 Nor Steps Disputes Access or Substantial Similarity.

Express spends considerable ardor discussing access and substantial similarity in its brief, but it is not clear why.  As to the two Steps-related shorts (Roth and New Bruin), Forever 21 and the Changs do not dispute access or substantial similarity in either the legal or literal senses.

As to the two White Owl related shorts (Jack and Ocean), Forever 21 and the Changs do not dispute access.  This admission, however, comes with a small caveat.  Access does not mean that Forever 21 actually accessed the two shorts in a literal sense.  It simply means that the work was widely disseminated.  *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 483 (9th Cir. 2000).  Forever 21 cannot speak for White Owl. Forever 21 does not dispute substantial similarity regarding the Jack or Ocean plaids.  However, the White Owl shorts are not identical to the two Express shorts they allegedly infringe.

### IV.   EXPRESS DOES NOT HAVE ENOUGH EVIDENCE OF SECONDARY MEANING OR LIKELIHOOD OF CONFUSION TO SURVIVE SUMMARY JUDGMENT ON THE TRADE DRESS CLAIM

The theme of Express's trade dress argument is that if one copies a design, then, *ipso facto,* that design has secondary meaning and the copying is likely to confuse consumers.  This is a gross misstatement of the law.  However, because that is the centerpiece of Express's motion, it bears discussion.

RUSS, AUGUST & KABAT

1

RUSS, AUGUST & KABAT

### A. No Court Has Found Secondary Meaning Based on Copying, Absent Overwhelming Independent Evidence of Secondary Meaning.

Under federal law, copying cannot make the difference between a finding of secondary meaning and a finding of no secondary meaning. Express argues otherwise by citing a few out-of-context quotes, which it does not even attempt to place in the context of the cited cases. A review of the facts and holdings of all of the cases cited by Express, the cases cited by Defendants here and in their own motion, shows that all of the cases can be reconciled, and that reconciliation mandates a grant of summary judgment in Defendants' favor. In short, absent either (1) overwhelming evidence of secondary meaning or (2) strong evidence of secondary meaning plus direct evidence of intent to actually pass off (rather than simply copy), evidence of intentional copying has at most a minor role in the determination of secondary meaning in trade dress cases.

### 1. Category I: Overwhelming Independent Evidence of Secondary Meaning Supports an Inference of Intent to Pass Off.

Express relies on the following five cases to support its position that proof of intentional coping alone is sufficient to establish secondary meaning.[5] Express attempts to supports its bold misstatement of the law on snippets of dicta. Actual analysis of the cases upon which Express relies reveals that each case involves facts more than sufficient to establish secondary meaning independently.

In *Adidas-Salomon Ag v. Target Corp.*, 228 F. Supp. 2d 1192 (D. Or. 2002), Adidas had evidence of (1) exclusive use since the 1960s; (2) extensive sales (millions); (3) 'numerous' unsolicited media mentions; (4) extensive advertising

---

[5] None of which deal with summary judgment.

across all media; and (5) a survey (used for likelihood of confusion, but relevant to both). *Id.* at 1209-10 and 121.

In *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609 (9th Cir. 1989) the plaintiff had (1) a survey showing secondary meaning and (2) substantial advertising. Although the court quoted dicta that copying supports an inference of secondary meaning, it did not address copying *at all* in its secondary meaning analysis.

In *Asics Corp. v. Skechers USA,* 2007 U.S. Dist. LEXIS 38048 (C.D.Cal. April 25, 2007), the plaintiff had (1) six years of continuous and exclusive use; (2) multiple advertisements of the shoe; and (3) inclusion of a federally registered and well-known Asics stripe design. *Id.* at *23-26. Although the *Skechers* court quoted dicta that copying supports an inference of secondary meaning, it did not consider copying in its secondary meaning analysis.

In *Lisa Frank, Inc. v. Impact Int'l, Inc.*, 799 F.Supp. 980 (D.Ariz. 1992), the plaintiff has (1) 300 letters a week from fans (consumer testimonials); (2) a survey showing secondary meaning; (3) $20 million in sales; (4) $1 million in advertising, many of which depict the trade dress; (5) extensive sponsorships; (6) exclusive use; and (7) actual confusion. Although the *Lisa Frank* court held intentional copying to be relevant, the record is clear that secondary meaning would have been found independent of copying.

In *Black & Decker Corp. v. Int'l Sales & Mktg.,* 36 U.S.P.Q.2d 1851 (C.D.Cal. 1995), plaintiff had (1) a survey showing an "extraordinary high level of consumer recognition that the [product] originates with [plaintiff]." *Id.*at *7; (2) "enormous" volume of sales; and (3) substantial investment in advertising and marketing. Like the other courts, the *Black & Decker* court held intentional

**FOREVER 21 DEFENDANTS' AND STEPS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

RUSS, AUGUST & KABAT

copying to be relevant in a single sentence, but it is clear that secondary meaning would have been found independent of copying.

These cases have several common threads.  First, they all reach a finding or state facts sufficient to make a finding of secondary meaning *independent of the issue of intentional copying*.  Thus, intentional copying was not strictly material to the findings in any of these cases; the facts could have firmly supported secondary meaning anyway.

A subtler point must also be made.  Because the evidence of secondary meaning in the above cases was so overwhelming, one could not credibly[7] explain the copying of the design as anything *other* than an attempt to pass off, a point discussed in more detail below.[8]

### 2. Category II: Insufficient Independent Evidence of Secondary Meaning – Intentional Copying Never Found Sufficient to Save Plaintiff's Claim.

What then, of cases where, independent evidence of secondary meaning is insufficient?  Can a plaintiff use evidence of intentional copying to bootstrap their way to secondary meaning?  *Courts in this circuit (and elsewhere) have emphatically held that a Plaintiff cannot succeed (or even survive summary judgment) if he cannot make his case independent of intentional copying.*

*Continental Lab. Prods. v. Medax Int'l*, 114 F.Supp.2d 992, 1013 (S.D.Cal. 2000) is most blunt on this point.  There, as here, the independent evidence of secondary meaning was insufficient, so the plaintiff relied on its "evidentiary centerpiece" of intentional copying to resist summary judgment on secondary meaning.

---

[7] None of these cases concern summary judgment, so credibility becomes relevant.

[8] For example, if a defendant began selling sneakers with a Nike swoosh on them, the court would no doubt conclude that the defendant intended to pass off his shoes as Nike's and thus use its good will, and would also no doubt include dicta about the relevance of copying, *but only because the evidence of secondary meaning in the swoosh is so overwhelming in the first place.*

11

RUSS, AUGUST & KABAT

1    The court first addressed the evidence, and held that a few isolated
2  advertisements, sales of 229,000 units, four years of exclusive use, and several
3  declarations regarding secondary meaning from affiliates were insufficient to
4  survive summary judgment. *Id.* at 1002-07. The court then turned to whether
5  evidence of intentional copying, which was overwhelming, was sufficient evidence
6  of secondary meaning to permit the plaintiff to survive summary judgment. The
7  Court emphatically held that copying alone was insufficient.

8    The *Continental* court is the sole in-circuit court to seriously grapple with
9  the relationship between intentional copying and secondary meaning. Although
10  Judge Whelan's discourse on this issue, at 1008 through 1013, really speaks for
11  itself, his conclusion bears quoting:

12    "placing evidentiary weight on intentional copying serves no Lanham
13    Act policy where, as here, the plaintiff's product design has no
14    secondary meaning. As the leading trademark treatise notes, if a
15    senior user has not obtained secondary meaning in a non-inherently
16    distinctive mark, then another's use of that mark cannot result in buyer
17    confusion, for buyers do not associate the mark only with the senior
18    user. In other words, absent secondary meaning, Defendants'
19    duplication and sale of [plaintiff's] product design, and conspicuous
20    display of that design in its own promotional materials, will not create
21    source confusion. *Even if Defendants attempted to deceive the public,*
22    *[plaintiff's] failure to create secondary meaning ensures that such*
23    *efforts could never succeed.* For the foregoing reasons, the Court
24    holds that Defendants' copying of Continental's product design does
25    not provide independent evidence of secondary meaning, and cannot
26    overcome summary judgment." *Id.* at 1013 (emphasis added).

27    Other in-circuit courts have also rejected the notion that evidence of
28  intentional copying can save an otherwise defective secondary meaning claim.

RUSS, AUGUST & KABAT

RUSS, AUGUST & KABAT

In *Walker & Zegner Inc. v. Paragon Indus.,* 549 F.Supp.2d 1168, 1181 (N.D.Cal. 2007) the plaintiff could not prove secondary meaning on its own, but had overwhelming evidence of intentional copying – the defendant had mailed plaintiff's tiles to China to be copied.  The Court nevertheless held that "Given the lack of direct and circumstantial evidence supporting secondary meaning, the court concludes that defendant's copying does not suffice."  Summary judgment issued in defendant's favor.

Likewise, in *Seed Lighting Design Co. v. Home Depot*, 2005 U.S. Dist. LEXIS 44741 (N.D.Cal. August 3, 2005), there was no evidence of secondary meaning other than clear intentional copying.  The court held:

> "Seed Lighting cannot establish secondary meaning merely by alleging that Defendants intentionally copied the Subject Lamp. While it is true that, "in appropriate circumstances, deliberate copying may suffice to support an inference of secondary meaning," in order to make this finding, the deliberate copying *must be* an intentional attempt to capitalize on a company's reputation or goodwill. Indeed, as the First Circuit noted in *Yankee Candle Company,* mere attempts to copy a product are not necessarily probative, since the copier may very well be exploiting a particularly desirable feature, rather than seeking to confuse consumers as to the source of the product." *Id.* at *21-22 (emphasis in original).

The Court also granted summary judgment to defendant.  *See also Yankee Candle Company, Inc. v. Bridgewater Candle Company, LLC*, 259 F.3d 25, 38 (1st Cir. 2001); *The Jewish Sephardic Yellow Pages, Ltd v. Dag Media, Inc.,* 478 F.Supp.2d 340, 370 (S.D.N.Y. 2006) (granting summary judgment to defendant even in the presence of evidence of intentional copying).

Although the dicta in the two categories of cases described above are arguably in conflict, the holdings are not.[9]  Where there is sufficient independent evidence of secondary meaning, courts generally add evidence of intentional copying to the factors in favor of secondary meaning (or simply cite the dicta re: intentional copying without comment).  Where, however, a plaintiff cannot establish secondary meaning on his own, no court in this circuit has used evidence of intentional copying to actually find secondary meaning.

### 3.    The Relevant Intent, to the Extent Intent Is Relevant, Is Intent to Pass Off, not to Copy the Design.

Particularly in product design or combination cases, it is copying with intent to confuse consumers, not copying *per se* that is relevant to the secondary meaning analysis.  In other words, copying is arguably relevant where there is evidence that *the defendant believed the thing in question had secondary meaning:*

> "[I]ntentional copying supports a finding of secondary meaning only where the defendant intended to confuse consumers and pass off its product as the plaintiff's.  In that situation, the defendant's belief that plaintiff's trade dress has acquired secondary meaning--so that his copying will indeed facilitate his passing off--is some evidence that the trade dress actually has acquired secondary meaning."
> *Continental, supra,* 114 F.Supp.2d at 1010.

This reasoning may provide a means of reconciling the dicta in *Adidas, Lisa Frank, Asics* and *Clicks* with the holdings of *Continental, Walker & Zegner,* and

---

[9] The same cannot be said if these cases are viewed through Express's theory of the case.  A review of the facts can harmonize Express's cases and those cited by Forever 21, and this harmonization mandates finding for Forever 21 – the conclusion is that evidence of copying cannot save an otherwise deficient trade dress claim.  In order for Express to win, this Court must find that the Northern and Southern Districts of California decided *Walker & Zegner, Continental* and *Seed* wrongly (in terms of *holding*), and that the First Circuit's decision in *Yankee* was also wrong.  Forever 21 respectfully submits that this Court should take the path that does not call for disagreeing with the holdings of several published (and circuit) cases.

RUSS, AUGUST & KABAT

RUSS, AUGUST & KABAT

*Yankee.* In *Adidas, Asics* and *Lisa Frank,* the independent evidence of secondary meaning was so overwhelming that one could not argue with a straight face that the intent was anything other than to pass off, rather than simply to copy a design (a simple Google image search for these plaintiffs makes the secondary meaning readily apparent). In *Clicks*, not cited by Express on this point, there was even direct evidence that the intent was to pass off, rather than simply to copy the design, in addition to a survey showing secondary meaning. *Clicks Billiards, Inc. v. Sixshooters, Inc.,* 251 F.3d 1252, 1263 (9th Cir. 2001) (defendant referred to his parlor as "Clicks west" in a case where the trade dress was the decor).

Here, there is no evidence that Forever 21 intended to pass off its goods as Express's, and Express's independent evidence of secondary meaning is too *de minimus* to give rise to the inference that Forever 21 must have intended to pass off. Indeed, Express has pointed out that by the time Forever 21 received the Express Jacket, all Express labels had been removed. SG 57. The relevant Forever 21 employees (Jenny Kim and Joseph Shin) testified that they had no idea the jacket was from Express. SG 132. As such, they *couldn't* have intended to confuse consumers. Specific intent to pass off is a necessary element of the copying at issue here (to the extent copying is relevant), and absent knowledge of the source, intent cannot be shown.

A plaintiff cannot make a case for secondary meaning with evidence of intentional copying alone. Express must have actual evidence that consumers associate the Express Jacket with Express.

## B. Express Has No Independent Evidence of Secondary Meaning.

Express has presented, in support of secondary meaning, evidence that (1) it sold approximately one track jacket per store every three days; (2) it displayed the jacket on a rack in the back of the store for about two months; and (3) the Express

website included a product page for the Express Jacket just like it did for nearly all other garments sold by Express.  Other courts have found this evidence insufficient to survive summary judgment, let alone call for it in plaintiff's favor.  Although this issue is briefed in far more detail in Forever 21's own motion for summary judgment, a few points bear mentioning.

First, "an expert survey of purchasers typically provides the most persuasive evidence of secondary meaning." *Walker & Zanger, Inc. v. Paragon, Indus.*, 549 F. Supp.2d 1168 (N.D.Cal. 2007).  Express has no survey.  SG 98.  On the other hand, Forever 21 has a survey showing no secondary meaning.  SG 99.  This unrebutted survey, regardless of Express's critique of its methodology,[10] shows no secondary meaning in the jacket.  This alone is sufficient to deny summary judgment.

Second, the total sales, less than 17,000 over four months, which comes to approximately one sale every three days per store, does not support a finding of secondary meaning.  SG 110-111.  Indeed, in *Asics,* cited by Express, a court found that sales of 213,000 units weighed *against* a finding of secondary meaning.  *Asics, supra, at* *25.

Third, *all* of the remaining indicia of secondary meaning are against Express.  Express has (1) no consumer testimonials (SG102); (2) no unsolicited media mentions (SG 100); (3) no evidence of actual confusion (SG 101); (4) no advertising other than on the product-specific page (SG 30, 103-105);[11] (5) a very short sales time frame – one season (SG 106-109); (6) lower sales than a comparable Express Jacket that did not have the purported trade dress (SG 115); and (7) the Express Jacket was on the low end of average for its department (SG

---

[10] Even if one accepted Express's position that the methodology was flawed, the survey would still be relevant to the Court's analysis.  In both *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir. 1989) and *Clicks Biliards, Inc. v. Sixshooters, Inc.,* 251 F.3d 1252, 1263 (9th Cir. 2001), the Ninth Circuit found deeply flawed surveys relevant to the imposition of a preliminary injunction and a denial of a motion for summary judgment.

[11] Express's specific assertions re: advertising and extent of sales are rebutted in detail in the SG.

16

RUSS, AUGUST & KABAT

25-27, 29).  The undisputed evidence shows that this was a one-off, unremarkable jacket, not a well-known design like the Adidas or Asics stripes or Black & Decker tools.  The undisputed facts show that Express cannot make a case for secondary meaning.

Finally, Express has far less evidence of secondary meaning than the factually apposite First Circuit case of *Yankee, supra*, in which the court *granted* summary judgment to the defendant on this issue. Yankee had (i) limited advertising; (ii) at least four years of exclusive use; (iii) high sales figures; (iv) evidence from retailers indicating similarity; (v) testimony from defendant re: distinctiveness; (vi) some evidence of actual confusion; and (vii) evidence of intentional copying, far more than Express here. *Yankee, supra,* 259 F.3d at 43.

Although Forever 21 and Steps agree with Express that the empirical facts of this case are fundamentally not in dispute, these facts do not support Express's claims, and Express's motion should be denied.

## C.   Express Had Not Even Attempted To Prove That Secondary Meaning Existed At The Time Forever 21 and Steps Committed The Allegedly Infringing Acts.

Express' motion fails for the separate and independent reason that even if there were secondary meaning at some point in time (which there is not), Express has not shown that there was secondary meaning at the time Forever 21 and Steps committed the allegedly infringing acts. *Green Bullion Fin. Servs., LLC v. Money4Gold Holdings, Inc.*, 639 F.Supp.2d 1356, 1364 (S.D.Fla 2009) ("When a mark has not yet obtained secondary meaning, the descriptive term is not protected and may be used freely by others. This point, the timing of obtaining secondary meaning, is central to the Court's analysis").  Logically, if Express had not achieved secondary meaning, or if any secondary meaning had dissipated, as of the time of Forever 21 and Steps's acts, then even if there were secondary meaning at one point in time (which there is not), their acts cannot be actionable.

RUSS, AUGUST & KABAT

RUSS, AUGUST & KABAT

1   Here, Forever 21's acts occurred on January 21, 2009, when Forever 21
2   ordered the jackets, and on May 7, 2009 going forward, when the jackets were put
3   on sale.  SG 117, 118.  On the first date, Express had sold only a few jackets.[12]  SG
4   116.  On the second date, the Express Jacket had already been on the sale rack for a
5   month.  SG 109, 119.  Express' own expert has claimed that consumers would not
6   remember any association that might have existed by that point in time.  SG 120.
7   Because Express failed to even allege that the jacket had secondary meaning on
8   May 7 or January 21, summary judgment cannot issue in Express's favor.

9        **D.**    **Express Cannot Show that the Purported Trade Dress is**
10           **Non-Functional.**

11  Although a secondary issue, Express also cannot show that the purported
12  trade dress is non-functional.   One element of the purported trade dress,
13  specifically the "mixed media," has been described as functional by both the
14  product page on the Express website and by one of Express's own witnesses. SG
15  121.   Furthermore, as can be ascertained from a visual examination of the Express
16  Jacket, the pockets are both functional and in traditional location.   SG 122.
17  Express therefore cannot show that its trade dress is non-functional.

18  **V.**    **EXPRESS'S CANNOT SHOW LIKELIHOOD OF CONFUSION**

19  Express does not, and cannot, take the position that a reasonable consumer
20  could believe  that the Forever 21 Jacket bearing a Forever 21 family label selling
21  at a Forever 21 store was somehow affiliated, related to or sponsored by Express.
22  Rather than confront this fundamental factual failing, Express twists the *Sleekcraft*
23  factors to obscure the fact that consumers are unlikely to be confused.[13]   Express's
24  analysis goes against the very purpose of the *Sleekcraft* test, which is to guide
25  courts in addressing the ultimate issue of confusion.

26
27  [12] The exact number is confidential, and reflected in the SG.
28  [13] This analysis is also particularly alien because likelihood of confusion is irrelevant in this case absent a showing of secondary meaning, which cannot be made.

2923-03 100726 Opp re MSJ.doc

18

1    Before delving into the factors, the Court may be enlightened by some

2    factual background.  The Express Jacket was sold/marketed in only two channels.

3    First, it could be purchased and seen in the back of an Express store.  30, 113, 131.

4    A consumer walking by the store or just peeking in could not see the jacket.  *Id.*

5    Second, it could be purchased or seen on the Express.com website, but only on the

6    product page – Express has not claimed it could be seen on the front page.  SG 30,

7    104-105.  Express only (or mostly) sells Express-branded goods.  SG 127.  The

8    Forever 21 Jacket was also only sold or marketed through two channels, Forever

9    21/Heritage 1981/XXI Forever stores, and the Forever 21 website.  SG 129.

10   Forever 21 sells, with only *de minimus* exceptions, only house-branded goods.  SG

11   127.

12   As to the jackets themselves, the Express Jacket has a large logo above the

13   chest pocket prominently featuring the federally registered Express griffin

14   trademark and the beginning of the word "Express."  SG 123.  The corresponding

15   graphic on the Forever 21 Jacket features no such logo, and the actual image is not

16   similar.  SG 124.  The Express Jacket features an Express label on the inside of the

17   neck, on the zipper pulls, and on a metal tag on the jacket.  SG 123.  The Forever

18   21 Jacket features the federally registered Heritage 1981 Mark on the inside of the

19   neck and on the hangtag.  SG 126.  The Forever 21 Jacket also contains a design

20   based on a prior Forever 21 shirt.  SG 125.

21   The Federal Circuit confronted an analogous fact pattern in *L.A. Gear, Inc.*

22   *v. Thom McAn Shoe Co.,* 988 F.2d 1117, 113 (Fed.Cir. 1993), and held there was

23   no likelihood of confusion under far more plaintiff-favorable facts.  The defendant

24   copied L.A. Gear shoes (which had secondary meaning), branded it as their own,

25   and began selling the 'strikingly similar' shoes at K-Mart.  *Id.* at 1122.  L.A. Gear

26   had a policy against selling its shoes in any discount stores.  *Id.*

27

28

RUSS, AUGUST & KABAT

The Federal Circuit found it was "clear error" to find likelihood of confusion on these facts because (1) the defendant put its own brand on the shoes; and (2) the shoes move in "different retail channels:"

> "We conclude that the conspicuous and permanent placement of the trademarks of L.A. Gear as well as the copyist, and the sophistication of purchasers of fashion athletic shoes, clearly outweigh the similarities in the shoe design, insofar as consumer confusion as to source is avoided. We think the district court was mistaken in viewing these consumers as unsophisticated and casual in these purchases. We agree with Appellants that purchasers of fashion athletic shoes are likely to be well aware of the sources of such shoes, when such sources are conspicuously marked on the shoes by both copier and originator." *Id.* at 1134. *See also DCNL Inc. v. Almar Sales Co.*, 47 USPQ2d 1406, 32-34 (N.D.Cal. 1997) (imitator's labeling and different packaging of look-alike hair brush held to prevent likely confusion); *Stormy Clime, Ltd. v. Progroup, Inc.* 809 F.2d 971, 977 (2d. Cir. 1987) (defendant's placing its own "trademark prominently on a label at the inside of the neck" weighed against likelihood of confusion).

The facts here are even more favorable to Defendants than in *L.A. Gear*. In *L.A. Gear*, a consumer could theoretically believe that the third-party branded sneaker sold at Foot Locker would also be available at a K-Mart. Here, in contrast, the two channels of trade are both exclusive, and no consumer could believe reasonably that he or she could purchase Express goods at Forever 21, or vice-versa.

Looking at the *Sleekcraft* factors in the above context, it is apparent that no reasonable consumer would be confused.

RUSS, AUGUST & KABAT

*Strength of the trade dress* – as held by the Supreme Court, design trade dress requires secondary meaning. Because there is no secondary meaning, as discussed above, this factor weighs heavily in Defendants' favor.

*Similarity*[14] – As discussed above, both the Forever 21 and Express jackets bear their own federally registered trademarks. SG 126, 123. There are also significant differences between the two jackets. SG 123-126. Under *L.A. Gear* and *DCNL*, this factor does not favor Express.

*Channels of marketing*– As discussed above, this factor weighs in Defendants' favor far more strongly than it did in *L.A. Gear*. Because the channels of marketing and sale never did and could not converge, and because no reasonable consumer could believe that he was buying an Express garment in a Forever 21 store, or vice versa, this factor weighs in favor of Defendants.

*Relatedness of Goods* – This factor is not particularly relevant here. The *DCNL* court did not consider it at all.

*Intent* - In Express's mind, copying is determinative of every single issue in this case. This issue is addressed extensively above. However, it can be noted that *GoTo.com,* cited by Express, has held that copying is a minor factor at best. *GoTo.com v. Walt Disney, Inc.,* 202 F.3d, 1199, 1208 (9th Cir. 2000) ("Another of the *Sleekcraft* factors that does not carry much weight in this setting -- despite the vigor with which the parties have contested it -- is Disney's intent in devising its mark").

*Evidence of actual confusion* – There is none. This factor weighs strongly in Defendants' favor. SG 101.

*Likelihood of expansion of product lines* – Express has testified that the Express Jacket was a one-off, and was not to be repeated. SG 24, 108. Express

---

[14] Express has argued that under *Goto.com,* above, similarity, channels of marketing, and relatedness of the goods are the controlling troika. However, *Goto.com* only holds that this is the case in internet cases. *See e.g. Perfumebay.com Inc. v. eBay Inc.,* 506 F.3d 1165, 1173 (9th Cir. 2007) (describing the above factors as the "internet trinity")

RUSS, AUGUST & KABAT

1   has further testified that it sold no other garments with the alleged trade dress.  SG

2   24.  This factor therefore also weighs in favor of Defendants.

3       *Type of goods and the degree of care likely to be exercised by the*

4   *purchasers.*  In light of the fact that these are both private label goods sold in

5   private label stores, this factor weighs in favor of Defendants 21.  SG 127.

6       The evidence shows there is no likelihood of confusion.  Courts addressing

7   similar cases have held that finding likelihood of confusion would be "clear error."

8   Express's motion for summary judgment should be denied.

9   **VI.   UNFAIR COMPETITION – EXPRESS HAS NOT PLEAD, AND**

10  **CANNOT PLEAD, UNFAIR COMPETITION BASED ON THE**

11  **SHORTS**

12      Express's unfair competition argument is particularly poorly taken, and

13  genuinely surprising.  As discussed below, copying of the shorts cannot support

14  unfair competition due to federal preemption, notwithstanding the bizarre legal

15  gymnastics undertaken in Express's motion.  More importantly, however, *unfair*

16  *competition based on the shorts is not even pled in the First Amended Complaint.*

17  The FAC discussed the Express shorts and Forever 21's copying at paragraphs 22

18  through 49 and 63 through 64.  Express's two unfair competitions claims expressly

19  exclude these paragraphs from its claim.  FAC at ¶ 75, 79.  Express has thus not

20  pleaded unfair competition relating to the shorts.

21      Indeed, when Forever 21's counsel attempted to question Express's 30(b)(6)

22  witness on secondary meaning accruing to the shorts, Express's counsel objected

23  to the line of questioning as beyond the scope of the case.  SG 136.  Copying of the

24  shorts has never been part of Express's theory of the case for unfair competition.

25  They therefore cannot raise the issue at trial, let alone ask the Court to grant them

26  summary judgment on it. *See Dream Games of Arizona, Inc. v. PC Onsite*, 561

27  F.3d 983, 995 (9th Cir. 2009) (refusing to consider the new theory because plaintiff

28  failed to assert the theory in complaint.).

RUSS, AUGUST & KABAT

2923-03 100726 Opp re MSJ.doc

22

Second, even if pled, the "reverse passing off" theory described by Express is barred as a matter of law under 2003 Supreme Court precedent:[15]

> "[D]esigns could not be protected under [the Lanham Act] without a showing that they had acquired secondary meaning, so that they identify the source of the product rather than the product itself. This carefully considered limitation would be entirely pointless if the "original" producer could turn around and pursue a reverse-passing-off claim under exactly the same provision of the Lanham Act. Samara would merely have had to argue that it was the "origin" of the designs that Wal-Mart was selling as its own line." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 36, 123 S. Ct. 2041, 2049(2003); *See also Williams v. UMG Recordings,* 281 F.Supp.2d 1177, 1184-85 (C.D.Cal. 2003) (holding that *Dastar* preempts reverse palming off claims under California unfair competition law); *Sivak v. Versen*, 2007 U.S. Dist. LEXIS 22430, *21-23 (S.D.Cal. March 27, 2007) (stating that under *Dastar*, reverse palming off claims under California unfair competition law are preempted).

The Supreme Court has thus rejected the exact reverse passing off claims alleged by Express, under both the Lanham Act and California Law, absent a showing of secondary meaning.  The unfair competition claims should thus be rejected because (1) they have not been pleaded as described in the motion; and (2) the theory described by Express is barred as a matter of law.

## VII.   THERE ARE DISPUTED ISSUES OF FACT REGARDING THE LIABILITY OF THE CHANGS

Express finally argues that, despite the fact that neither Do Won Chang nor Jin Sook Chang has any meaningful involvement in the running of the men's

---

[15] *Salim v. Lee,* cited by Express, was decided in 2002.

2923-03 100726 Opp re MSJ.doc

RUSS, AUGUST & KABAT

department at Forever 21, they must be personally liable for any acts it undertakes.[16] This is inconsistent with the law.  As Express concedes in its motion, Mr. Chang has no involvement in merchandising-related matters.  Motion at 23:11.  No Court has held that one's status as CEO of a company makes one personally liable for every act of a company.

Express's own case law does not support its position here.  *Southern Bell Tel. & Tel. Co. v. Associated Tel. Directory Publishers,* 756 F.2d 801, 811 (11th Cir. 1985), only held that a corporate employer has responsibility for its employees acts.  It also arguably included individuals in a supervisory position, but Express has not alleged that Mr. Chang acts as the supervisor for either Mr. Klunchoo or Ms. Kim.  *Microsoft Corp. v. Image & Bus. Solutions, Inc.*, 2007 U.S. Dist. LEXIS 76519 at *6 (C.D. Cal. May 4, 2007) concerned what was essentially a one-man operation, with a single individual that acted as owner, officer, and day-to-day manager.  This fact pattern is orders of magnitude removed from Forever 21, which Express describes as "one of the largest privately held corporations in the United States."  FAC ¶ 20.  To Forever 21's knowledge, no court has ever permitted individual liability based solely on ownership and overall theoretical control for a company of Forever 21's size and scope.

Express is essentially contending that for privately held companies, the corporate shield is meaningless, even where there are no meaningful alter ego or ability to pay questions.  This is a radical contention, and particularly unsuited for summary judgment.

As to Mrs. Chang, there is no evidence that she acts as a supervisor in a meaningful sense to the buyers in the men's department.  And contrary to Express' allegations that there is no Head Buyer of the men's department, Joseph Shin does

---

[16] Although not raised, there are no meaningful alter ego issues here.  Alter ego liability cannot apply when the corporate entity is solvent.  Although Forever 21 is not liable for any acts here, it is more than financially able to pay any judgment that could possibly result from this case.

2923-03 100726 Opp re MSJ.doc

RUSS, AUGUST & KABAT

24

1  act as the head of Men's in all meaningful senses.  SG 137.  Mrs. Chang's role as

2  head buyer generally does not make her personally liable for every act.

3      It also bears noting that Express's counsel, having deposed Mrs. Chang and

4  numerous Forever 21 officers in an unrelated matter barely a month before filing

5  the complaint in this matter, should have been well aware of the fact that the

6  Changs had no personal involvement in the production or sale of the garments at

7  issue in this case.  They were added to the complaint solely for the purposes of

8  harassment.  In any event, at the very least, Express has not shown that the

9  Changs' ownership of a solvent company makes them personally liable for all of

10  its debts.  As such, summary judgment should be denied on this issue.

## VIII. CONCLUSION

12      For the reasons stated above, Defendants respectfully request that the Court

13  deny Express's motion for summary judgment, and issue summary judgment

14  against Express on all of its claims for relief.

16  DATED:  July 26, 2010            RUSS, AUGUST & KABAT
                                     Larry C. Russ
17                                   Nathan D. Meyer

19                                   By:  /s/ Larry C. Russ____
                                     Attorneys for Defendants Forever
20                                   21, Inc., Forever 21 Retail, Inc.,
                                     Forever 21 Logistics, LLC, Do Won
21                                   Chang and Jin Sook Chang

22  DATED:  July 26, 2010            LEVINSON ARSHONSKY & KURTZ, LLP
                                     Robert A. Levinson
23                                   Angie S. Lee

24                                   By:  /s/ Angie S. Lee____
                                     Attorneys for Defendant Steps
25                                   Apparel Group, Inc

FOREVER 21 DEFENDANTS' AND STEPS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

RUSS, AUGUST & KABAT

1

**CERTIFICATE OF SERVICE**

2

    I hereby certify that on July 26, 2010 the foregoing document described as

3

4

**FOREVER 21 DEFENDANTS' AND STEPS' OPPOSITION TO**

5

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** was filed

6

7

electronically via the Court's Electronic Case Filing System (ECF).  Notice of the

8

filing is being served upon all counsel of record automatically through Notice of

9

Electronic Filing.

10

11

12

13

                                       /s/ Nathan D. Meyer

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RUSS, AUGUST & KABAT