1  COLUCCI & UMANS
   FRANK J. COLUCCI (*Pro Hac Vice*)
2  fcolucci@colucci-umans.com
   DAVID M. DAHAN (*Pro Hac Vice*)
3  ddahan@colucci-umans.com
   218 East 50th Street
4  New York, New York 10022
   Telephone:  212.935.5700
5  Facsimile:   212.935.5728

6  BUCHALTER NEMER
   Russell L. Allyn (SBN: 143531)
7  rallyn@buchalter.com
   1000 Wilshire Boulevard, Suite 1500
8  Los Angeles, California 90017-2457
   Telephone: 213.891.0700
9  Facsimile: 213.896.0400

10
   Attorneys for Plaintiff,
11 EXPRESS, LLC

12            **UNITED STATES DISTRICT COURT**

13            **CENTRAL DISTRICT OF CALIFORNIA**

14 EXPRESS, LLC,                          )  **Civil Action No.**
                                          )  **2:09-cv-04514-ODW-VBK**
15            Plaintiff,                   )
                                          )
16      v.                                )
                                          )  **DECLARATION OF FRANK J.**
17 FOREVER 21, INC.; FOREVER 21           )  **COLUCCI IN OPPOSITION TO**
   LOGISTICS, LLC; FOREVER 21             )  **DEFENDANTS' MOTIONS FOR**
18 RETAIL, INC.; JIN SOOK CHANG;          )  **SUMMARY JUDGMENT**
   DO WON CHANG; WHITE OWL                )
19 CLOTHING, INC.; STEPS APPAREL          )
   GROUP, INC. dba STEPS OF CA; and       )
20 DOES 1 through 10, inclusive,          )  Discovery Cutoff: July 5, 2010
                                          )  Pretrial Conf.: September 13, 2010
21            Defendants.                 )  Trial: October 5, 2010
                                          )
22                                        )
                                          )  Date: August 16, 2010
23                                        )  Time: 1:30 p.m.
                                          )
24                                        )
                                          )
25                                        )  HONORABLE OTIS D. WRIGHT, II
                                          )
26                                        )
                                          )
27                                        )
                                          )
28                                        )

DECLARATION OF FRANK J. COLUCCI IN
OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

1

## DECLARATION OF FRANK J. COLUCCI

2     Pursuant to 28 U.S.C. § 1746, **Frank J. Colucci** declares under penalty

3  of perjury as follows:

4     1.    I am a member of the law firm of Colucci & Umans, counsel for

5  Plaintiff, Express, LLC ("Express" or "Plaintiff"), and as such I am fully familiar

6  with the facts hereinafter set forth of my own personal knowledge.

7     2.    Attached hereto and incorporated herein as Exhibit 1 is a true and

8  accurate copy of "Expert Report of Ralph Oman, Esquire," dated May 10, 2010.

9     3.    Attached hereto and incorporated herein as Exhibit 2 is a true and

10 accurate copy of "Supplemental and Rebuttal Expert Report of Ralph Oman," dated

11 May 21, 2010.

12    4.    Attached hereto and incorporated herein as Exhibit 3 is a true and

13 accurate copy of "Rebuttal Expert Report of Michael B. Mazis, Ph.D.," dated May

14 28, 2010.

15    5.    Attached hereto and incorporated herein as Exhibit 4 is a true and

16 accurate copy of "Second Supplemental Expert Report of Ralph Oman," dated June

17 10, 2010.

18    6.    On April 22, 2010, the deposition of Michael Tower, Senior Designer

19 of Express, was taken by Forever 21.  Attached hereto and incorporated herein as

20 Exhibit 5 are true and accurate copies of pertinent transcript excerpts from Mr.

21 Tower's deposition testimony.

22    7.    On April 23, 2010, the deposition of Randall Pyles, Senior Buyer at

23 Express, was taken by Forever 21.  Attached hereto and incorporated herein as

24 Exhibit 6 are true and accurate copies of pertinent transcript excerpts from Mr.

25 Pyles's deposition testimony.

26

27

28

1        I declare under penalty of perjury under the laws of the United States that the

2   foregoing is true and correct.

3   Dated:   New York, New York

4            July 26, 2010

5

6

7                                         Frank J. Colucci

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EXPRESS, LLC ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Case No.: CV09-04514(ODW)(VBKx)** |
| ) | |
| FOREVER 21, INC., ET AL. ) | |
| ) | |
| Defendant ) | |
| ) | |

## EXPERT REPORT OF RALPH OMAN, ESQUIRE

I have been retained by the attorneys for plaintiff Express, LLC, to serve as an expert witness, and as a testifying expert witness. This report is submitted pursuant to Fed. R. Civ. P. 26(a)(2). I reserve the right to supplement or amend this report pursuant to Fed. R. Civ. P. 26(e) if additional information affecting my opinion becomes available. If called as a witness in this case, I could and would make the following statements of my own personal knowledge and experience.

## I. QUALIFICATIONS

Currently, I am the Pravel Professorial Lecturer in Patent and Intellectual Property Law at the George Washington University Law School, where I have taught copyright law for 17 years. I have a total of 35 years of experience in domestic and international copyright law and administration. My qualifications, which are set forth in my curriculum vitae attached as Exhibit A, include my education, training, and experience in the area of copyright legislation and United States Copyright Office practice and procedure.

Ex. 1 4

202 994 3377          GWU Faculty E415              GWU Faculty E415              05:03:26 p.m.     05-10-2010          3 /17

From 1985 through 1993, I served as the Register of Copyrights of the United States. As the Register of Copyrights, I was the chief government official responsible for administering the U.S. copyright system. Among other responsibilities, the Register of Copyrights makes rulings on the copyrightability of works and supervises the work of the Registration Specialists who examine the applications. I am familiar with Copyright Office rules, regulations, and procedures, including those that relate to the examination and registration of works of the visual arts, including fabric designs and decorative elements on apparel and accessories.

During my tenure, I supervised the revision of the *Compendium of Copyright Office Practices*, which is a manual of practices and procedures that is primarily intended for use by the Copyright Office's staff. I also supervised the 1990 revision of Circular 40, which is an official publication that summarizes the registration and deposit procedures for works of the visual arts. This publication is intended for use by the general public.

As the Register of Copyrights, I acted as principal advisor to members of Congress on copyright policy and legislation. As Register, I testified more than 40 times before Congress on proposed copyright legislation and the state of the Copyright Office. I continue in that advisory role at the George Washington University Law School. In September 2008, I testified before the House Judiciary Committee on pending copyright legislation, and in August 2009, I testified before the Senate Judiciary Committee on a copyright bill that was introduced by the Chairman, Senator Patrick Leahy of Vermont.

Internationally, as Register I represented the United States at official meetings and diplomatic conferences, and I served as principal advisor to the U.S. Department of State on copyright matters, including drafting, negotiating and implementing copyright treaties. During

Ex. 1
5

202 994 3377          GWU Faculty E415                    GWU Faculty E415                    05:03:59 p.m.      05-10-2010          4 /17

my tenure as Register, I helped move the United States into the Berne Convention for the Protection of Literary and Artistic Works, a goal sought by U.S. Registers for over 100 years.

Before becoming Register, I served in several other government positions, including Chief Counsel of the U.S. Senate Subcommittee on Patents, Copyrights, and Trademarks. I also served, from 1975 through 1977, as Chief Minority Counsel on the Subcommittee on Patents, Trademarks and Copyrights. In that capacity, I participated in the final drafting and negotiations that led to passage of the landmark U.S. Copyright Revision Act of 1976, the current statute.

I am a graduate of Hamilton College (A.B., 1962) and Georgetown University Law Center (J.D., 1973), where I served as Executive Editor of the Georgetown Journal of International Law. I served two tours of duty as a Naval Flight Officer with my squadron in Vietnam before entering law school. I am also a former Foreign Service Officer in the U.S. diplomatic corps, having served two years as Third Secretary of Embassy in Saudi Arabia. I am a past president of the Giles S. Rich American Inn of Court (Washington's intellectual property Inn), a former Trustee of the Copyright Society of the U.S.A., and Immediate Past Chair of the Intellectual Property Law Section's Copyright Division. Just recently I was promoted to the Section's governing council. I also serve as the Section's Copyright Liaison to the World Intellectual Property Organization (WIPO) in Geneva. In private practice, I have been a frequent delegate to WIPO meetings, including the series of meetings that led to the 1996 Diplomatic Conference that modernized the Berne Convention and resulted in the passage of the Digital Millennium Copyright Act of 1998. In December 2009, I traveled to WIPO headquarters in Geneva to represent the Intellectual Property Law Section of the American Bar Association (ABA) at a meeting of the Standing Committee on Copyright and Related Rights, at which meeting the WIPO considered three new treaties in which the United States has an interest.

Ex. 1
6

At George Washington University Law School, I teach two advanced copyright seminars and the basic copyright course, which covers the copyrightability of pictorial, graphic and sculptural works, Copyright Office registration procedures (including the registration of works of the visual arts), substantial similarity, and the essentials of copyright protection. I have also written numerous articles and delivered many speeches addressing copyright and related rights. A list of the articles and speeches I have authored in the past ten years on subjects relating to copyright law is attached in Exhibit B. I am also the author of a book entitled *Copyright: Engine of Development*, published in Paris by UNESCO. In 1993, I received the International Book Award from the International Publishers Association, and in 2002 I received the Jefferson Medal in recognition of my lifelong contribution to intellectual property law.

On numerous occasions I have submitted expert reports in judicial proceedings as an expert in the area of copyright law. My prior trial and deposition testimony is listed in the attached Exhibit C.

## II. COMPENSATION

My work on this case is being billed at my customary rate of $350 per hour. My payment is not contingent upon the outcome of the case.

Ex. 1

7

## III. MATERIALS REVIEWED

1. *Express, LLC v. Forever 21, Inc., et al.* (United States District Court, Central District of California) (Case No.CV09-04514), First Amended Complaint for Copyright Infringement, including Exhibits A through P.

2. *Express, LLC v. Forever 21, Inc., et al.* (United States District Court, Central District of California), Forever 21 and Chang Defendants' Answer to Plaintiff's First Amended Complaint.

## IV. EXPERT OPINION

### A.    Introduction

The Copyright Act protects "original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced or otherwise communicated, either directly or with the aid of a machine."

In this context the word "authorship" means that the work was created by the copyright claimant and that it was not copied from someone else. The word "original" means that the work contains some minimal level of creativity. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991). "[T]he requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude or humble or obvious' it might be." *Id.*

Even so, the Copyright Office has identified several types of works that do not satisfy this fundamental constitutional and statutory requirement. For example, the Copyright Office will not register individual words, short phrases, slogans, typeface designs, or common symbols, such as a crescent, an arrow or a standard five-pointed star. *Compendium of Copyright Office*

Ex. 1
8

202 994 3377          GWU Faculty E415                    GWU Faculty E415                    05:05:29 p.m.      05-10-2010        7 /17

*Practices,* §202.02(i), §§503.02(a) and (b), 503.3(b) (1998).  Nonetheless, copyright protection

may be available for the overall creative selection and arrangement of such letters, shapes or

designs in a compilation, as long as that compilation is original and not trivial or *de minimus.*  It

"must consist of something more than the mere bringing together of two or three standard forms

or shapes with minor linear or spatial variations." *Id.* §503.02(b).

      Similarly, the Office will not register standard common geometric figures or shapes in

two or three dimensional form, such as a cone, cube, sphere, hexagon, square, or circle, because

copyright law does not protect familiar symbols or designs. C.F.R. §202.1(a).  But, again,

copyright protection may be available for an author who selects and arranges those shapes to

create "a compilation." In the same way, copyright protection may be available for an author

who designs a linear grid or pattern using an arrangement of straight lines of various spacing,

shading, colors and/or widths.  This creativity represents human authorship, and, if original, it is

protected by copyright.  As Judge (now Justice) Ginsburg noted in her opinion in *Atari v. Oman,*

"[r]ecalling the creativity of the work of Mondrian and Malevich, for example, we note that

arrangement [of boxes and straight lines] itself may be indicative of authorship." 979 F.2d 242,

243 n.1 (D.C. Cir. 1992) (Ginsburg, J.)

      After a short discussion of the standards for registrability that the Copyright Office

applies in deciding whether or not to register a work, I will apply these general principles to the

fabric designs that are at issue in this case.


    **B.**     **Registration in the U.S. Copyright Office**

      Section 411(a) of the U.S. copyright law states that U.S. authors must register

their works with the U.S. Copyright Office as a precondition to filing a copyright infringement

Ex. 1 q

202 994 3377            GWU Faculty E415            GWU Faculty E415            05:06:01 p.m.   05-10-2010            8/17

action in U.S. district court.  Congress imposed this requirement because it believed that the trial

court would benefit from the Copyright Office's initial assessment of a plaintiff's claims to

copyright.  If the Copyright Office registers a plaintiff's claim, the court may draw certain

conclusions from that office action.  For instance, § 410(c) of the copyright law states that a valid

registration certificate constitutes *prima facie* evidence of the validity and ownership of a

copyright, provided the certificate is obtained before the work has been published or within five

years thereafter.  Therefore, in litigation a plaintiff may satisfy his or her burden of proof on

these issues of copyrightability and ownership by simply offering the registration certificate into

evidence.  But the registration certificate does not foreclose an examination of these issues by the

court.  If the defendant offers credible evidence that convinces the court that the work as a whole

is not eligible for copyright protection because, for example, it is in the public domain, or that the

specific part of the work that is allegedly infringed is not eligible for copyright protection, or that

the work is not original with the copyright claimant, then the burden of proof shifts back to the

plaintiff, and the judge must decide what weight the certificate should be given, if any.  If the

court ultimately finds that the work (or the relevant portion of the work) is not protected by

copyright, the copyright claim must fail, and the Copyright Office would normally cancel the

registration.  Nonetheless, under current law, the Copyright Office is considered the expert

agency, and its determinations on ownership and copyrightability are entitled to some deference

by the courts.

In this case, Express LLC registered its various plaid designs that are at issue in this case.

The Copyright Office registered all of the designs, as we say in the trade, "clean."  The

Copyright Office did not correspond with the remitter, and I see no evidence of questions from

the Registration Specialists in the Copyright Office as to copyrightability.  In other words, the

Ex. 1

10

Copyright Office viewed these applications as routine and concluded that the fabric designs were entitled to registration as a matter of course, without question. Those registration certificates, therefore, are in my opinion powerful evidence of the copyrightability of the Express plaid designs.

That being said, it is important to bear in mind that the Copyright Office only registers a "claim" to copyright in a particular work. A copyright gives the copyright owner the right to use that work in a number of ways, such as the right to reproduce and distribute copies of the work to the public. However, these rights are not "granted" by the U.S. government. Under the Copyright Act, they exist from the moment that the work has been fixed in a tangible medium of expression. In other words, the copyright in a particular work does not depend on the Copyright Office's determination that it exists. Indeed, registration in the U.S. Copyright Office is entirely voluntary, and the vast majority of U.S. works protected by copyright are never formally registered. Of course, a copyright registration does create a presumption that the work is protected by copyright, but, as discussed above, that presumption can be rebutted. The actual metes and bounds of the copyright are defined by the authorship that appears in the work, as determined, ultimately, by the courts.

C.      **The Legal Principles that Guide Copyright Office Examination**

1.      <u>Registration of Useful Articles</u>

The Copyright Office will register designs related to useful articles, but only if the design contains pictorial, graphic, or sculptural elements that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the useful article. The reason for this rule is simple. If the Copyright Office registered useful articles, such as clothing,

Ex. 1   11

202 994 3377          GWU Faculty E415                GWU Faculty E415                05:07:07 p.m.      05-10-2010          10/17

without taking their utilitarian aspects into account, (1) a copyright owner could use his or her copyright registration to prevent others from copying those utilitarian aspects long after a patent for those aspects would have expired, or (2) a copyright owner could get the equivalent of patent protection for a useful article that is not eligible for patent protection.

As a general rule, the Copyright Office will not register a claim to copyright in the three-dimensional aspects of clothing if the garment does not contain creative authorship that can be separated from the basic function of the garment itself. For instance, the cut of the leg of the shorts, or the shape of a collar on a shirt, would not be eligible for copyright protection because their shape and configuration serves an intrinsic utilitarian purpose, namely, to cover the thigh or to keep the wind or the sun from the neck.

That having been said, the Copyright Office will register a two- or three- dimensional pattern that has been printed or embossed onto, or attached to, the surface of the shorts. Unlike the overall shape, a surface decoration can be identified as physically or conceptually separate from, and capable of existing independently of, the utilitarian aspects of the garment. As the Copyright Office has explained:

> Registration of claims to copyright in three-dimensional useful articles can be considered *only* on the basis of separately identifiable pictorial, graphic, or sculptural features which are capable of independent existence apart from the shape of the useful article. Determination of separability may be made on either a conceptual or physical basis. Conceptual separability means that the pictorial, graphic, or sculptural features, while physically inseparable by ordinary means from the utilitarian item, are nevertheless clearly recognizable as . . . pictorial, graphic, or sculptural works which can be visualized on paper, for example, or as free-standing sculpture, as another example, independent of the shape of the useful article[. In other words], the artistic features can be imagined separately and independently from the useful article without destroying the basic shape of the useful article. The artistic features

Ex. 1

12

202 994 3377          GWU Faculty E415                    GWU Faculty E415                    05:07:42 p.m.     05-10-2010          11 /17

and the useful article could both exist side by side and be
perceived as fully realized, separate works – one an artistic
work and the other a useful article. Thus, carving on the
back of a chair, or pictorial matter engraved on a glass
vase, could be considered for registration. *Compendium II*
§§ 505.02, 505.03 (emphasis added).

The garments in this case are all useful articles, and therefore fall into that special

category of examination reserved for useful articles. After studying the garments in this case, I

conclude that the decorative plaid fabric designs are all clearly conceptually separable from the

garments themselves, and were properly registered by the Copyright Office.

<u>2.        The Idea/Expression Dichotomy</u>

Copyright law encourages the creation of, and demand for, original authorship by

protecting creative expression, but it does not apply to the <u>ideas</u> that inform and inspire the

expression. 17 U.S.C. § 102. Only patent law protects ideas. The reason for this prohibition is

clear. As noted above, if an author could use copyright law, with its term of protection of life of

the author plus 70 years (or 95 years for a corporate author), to prevent others from using the

basic idea that he or she incorporated into the design, that law would hinder rather than promote

the creation of original works of authorship. It would also run afoul of the First Amendment.

Courts avoid this result by invoking the Idea/Expression Dichotomy to deny copyright

protection.

In this case, the "idea" would be "making a pair of plaid shorts," and the

protected "expression" would be any decorative detailing that reflects copyrightable authorship,

such as the design of the plaid fabric. By giving copyright protection to Express for its various

plaid designs, we are not preventing anyone else from making and selling plaid shorts. All we

are saying is that no one can copy Express's expression—its version of the plaid shorts, with its

original fabric design. As a result, we have no problem with the Idea/Expression Dichotomy in

Ex. 1
13

this case. If Express had sought to register the "idea" of "plaid shorts" in its registration application, the Copyright Office would have struck that claim from the application. A competitor can and should be allowed to copy that idea. Once we move beyond that generalized idea, however, we get into expression, which, if original and not *de minimus*, merits copyright protection.

### 3. The Merger Doctrine

The Merger Doctrine, simply stated, says that when a work, normally a textual work or computer program, expresses an idea, and that idea can only be expressed in one way, or in a limited number of ways, it cannot be afforded copyright protection. In other words, it can be freely copied, because Congress did not want authors to gain an exclusive right over an idea. If the idea does "merge" with the expression, the Merger Doctrine prevents the author from copyrighting that expression because otherwise he or she would effectively have a monopoly over the basic thought or concept that the expression represents. In this case, by giving copyright protection to the Express plaid designs, we are not violating the Merger Doctrine. There are literally an infinite number of ways to create a plaid, and, by protecting the Express designs, we are not inhibiting anyone else's ability to create his or her own original plaid designs. In fact, it is very important to note that the copyright concept of independent creation (so foreign a concept in the patent world) would allow another designer to create exact copies of the Express plaid designs without running afoul of the copyright law. All the competitor cannot do is copy the Express designs, which is exactly what defendants appear to have done in this case. As a result, Express need have no concern about the Merger Doctrine.

Ex. 1   14

202 994 3377          GWU Faculty E415          GWU Faculty E415          05:08:47 p.m.     05-10-2010          13 /17

### D.       Discussion of the Registrations and the Existence of Copyright Protection

Let me note at the outset that all of the registration certificates for all of the works in this case are valid.  Let me also mention that, after a comparison of the Express copyright deposits side-by-side with photographs of the Forever 21 garments, I see a clear case of substantial similarity.  Actually, I would say it is more than substantial similarity.  It is exact copying.  The fabric designs in defendants' garments are identical to the Express designs.  I do not see how one could deny that one was copied from the other, with the exact same patterns, the exact same colors, and the exact same orientation and arrangement of the design within the garment.

I also note that the normal defenses do not appear viable.  The defense of independent creation is not pleaded.  The exact copying of the entire work for commercial purposes would not qualify as a fair use.  And I have seen no evidence to suggest that any of the Express designs are in the public domain.

Three issues require further discussion--first, the lack of registration of the Express designs in the Copyright Office before the infringement; second, the absence of copyright notice on the works; and, third, the claim that as a result of this lack of registration and notice the defendants had no way of knowing that the Express designs are protected by copyright.

By way of introduction, I note that the United States prides itself on the evolution of its copyright system from one that was marked historically by oppressive formalities to one that is essentially formality-free.  I am personally proud of my modest role in helping to bring about this evolution.  A formality, of course, is a formal requirement with which an author must comply to secure and preserve his or her copyright in a work.  For instance, prior to 1989, an author had to publish his or her work with copyright notice—the © with the author's name and date.  If it were published without notice, the work fell into the public domain forever.  Similarly, if an author failed to register the work and neglected to send two copies of the best edition to the

Ex. 1
15

Library of Congress, he or she could not get federal copyright protection. And if an American author published his or her work overseas, the work would fall into the public domain.

Beginning in 1978, when the 1976 Copyright Act went into effect, and after 1989, when the United States joined the Berne Convention, most of these formalities disappeared. Copyright now exists from the moment of creation. Today, to secure and preserve copyright in his or her work, the author need do nothing more than fix that work in a tangible medium of expression, be it on paper, on a CAD, on a CD, or on a DVD. Both registration and notice are now optional, and the assumption is (and has to be) that all works enjoy copyright protection.

Potential copyists act at their peril if they decide to go forward with their copying because the work was not registered or because the work bears no copyright notice. This is an especially dangerous rationale for the copyist of a garment or fabric design today, since the notice is optional. Therefore, I find it disingenuous that the defendants would contend that they didn't know that the fabric designs that they used in the products were protected by copyright because they didn't discern a copyright notice. If I may say so, this representation falls into the "willful blindness" category.

In addition to the assumption that virtually all post-1978 fabric designs are protected by copyright, there are many other ways that the defendants could find out if a design is or is not protected. As I understand the facts, the defendants assert three primary reasons to justify their actions. First, some or all of them say that they thought that all plaid designs are in the public domain. Second, some or all of them contend that it is impossible to make the determination of copyright when all one has is a small sample swatch of the fabric in question, without any copyright notice and without any other indication of ownership. And, third, some or all of them contend that it is impossible to make the determination of copyright on a fabric design when all

Ex. 1

16

202 994 3377          GWU Faculty E415                    GWU Faculty E415                    05:09:55 p.m.      05-10-2010          15/17

one has is a sample garment, without a label in the garment and without a copyright notice on the garment.  I will address each of these contentions in order.

*First, all plaid designs are in the public domain.*  The defendants could have consulted a copyright lawyer to confirm that understanding, and they would have been informed otherwise—that if the design is original and not *de minimus*, plaids fall within the subject matter of copyright.  They could have conducted an online search of the Copyright Office records and found hundreds of registrations for plaid designs.  Given the financial resources of Forever 21, the company could have afforded the fees of a copyright lawyer.

*Second, the lack of copyright notice on the small fabric swatch made it impossible to determine if the fabric was protected by copyright and, if so, to track down the owner.*  Under the circumstances, a careful business executive in the clothing industry would have asked the supplier to provide a copyright registration certificate, or would have insisted that the supplier apply for registration for the design in the U.S. Copyright Office.

*Third, the lack of labels and copyright notice in the sample garments made it impossible to determine ownership of the fabric design.*  If the defendants had uncovered no evidence of copyright for the garments or fabric designs, they could have proceeded down several paths. First, they could have simply used another plaid design that they had created from scratch, or one for which copyright was clear—a traditional public domain plaid design or one that could be bought or licensed in the normal manner.  Second, the defendants could have played Russian roulette and covered their eyes, held their noses, and gone forward with the deal and risk large liability for copyright infringement.

In my experience, a reputable business executive would rarely choose to copy a garment or fabric design without learning whether or not it is copyrighted.  Caution is particularly the wisest

Ex. 1 17

202 994 3377          GWU Faculty E415                    GWU Faculty E415                    05:10:29 p.m.      05-10-2010          16/17

path to follow when ordering product from the People's Republic of China. For the third year running, the United States Trade Representative has just fingered China as the world's most notorious haven for copyright piracy and counterfeiting. With no respect for authorship and little or no government enforcement of intellectual property, China is an international renegade, and American business executives who deal with Chinese suppliers must take special steps to confirm the authenticity of the products they import. The proper presumption in dealing with China is that all product is pirated unless proven otherwise by fail-safe authentication.

From my reading of the limited record that I have had access to, I conclude that the defendants did not exercise due diligence in this case. Copyright is a strict liability tort, and it is absolutely no defense for a defendant to claim that he didn't think that a fabric design was protected by copyright, or to contend that it was difficult to confirm ownership of a particular design. Such questions are simply irrelevant in a copyright infringement analysis. In this case, the law is clear. A company or individual cannot copy something without first determining whether or not it is protected by copyright, since the presumption today is that everything created after 1978 is so protected. At each level in this case, the defendants have tried to invoke the "I-didn't-know-it-was-copyrighted" defense. The vendor claimed ignorance of the copyright status of the fabric when it sold its product to Forever 21, and Forever 21 in turn asserted that it had no way of knowing one way or the other if the designs were protected by copyright. In other words, no one at any stage of this transaction made the all-important copyright inquiry. Up and down the chain of distribution, the defendants chose to play Russian roulette, and they got caught. Their actions reflect a reckless disregard of the copyright law.

Ex. 1 18

## V.  CONCLUSION

For all of these reasons, I conclude that the plaid fabric designs at issue in this case are copyrightable subject matter, that the Copyright Office was correct in registering the Express designs, and that the registration certificates are entitled to the usual *prima facie* presumptions of validity.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: May 10, 2010

By: _____
     Ralph Oman

Ex. 1

19

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EXPRESS, LLC | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) Case No.: **CV09-04514(ODW)(VBKx)** |
| | ) |
| FOREVER 21, INC., ET AL. | ) |
| | ) |
| **Defendants** | ) |
| | ) |

## SUPPLEMENTAL AND REBUTTAL EXPERT REPORT OF RALPH OMAN

I have been retained by the attorneys for plaintiff Express, LLC, to serve as an expert witness, and as a testifying expert witness. On May 10, 2010, I submitted an expert report pursuant to Fed. R. Civ. P. 26(a)(2). In that report, I reserved the right to supplement or amend that report pursuant to Fed. R. Civ. P. 26(e) if additional information affecting my opinion became available. I have just read the expert report of defendants' witness, Ilse Metchek, and I submit this supplemental and rebuttal expert report in response to several points Ms. Metchek makes in her report.

### A.     Introduction

Ms. Metchek makes two points that require a response. First, she states that plaid fabric designs are not, and should not, be protected by copyright. And, second, she asserts that designing a plaid fabric is a mechanical process, one in which human creativity plays no role. I am taken aback to learn that the President of the California Fashion Association would hold such

Ex-2
20

views, and I will respond briefly to both points in this supplemental report.

**B.      Copyrightability of Plaid Designs**

As I noted in my original report, the United States Copyright Office routinely registers plaid fabric designs.  As long as the design consists of "something more than the mere bringing together of two or three standard forms or shapes with minor linear or spatial variations," *Compendium of Copyright Office Practices*, §503.02(b), and as long as it is original and not trivial or *de minimis*, it will qualify for registration in the Copyright Office.

As I also noted, the Copyright Office will not register standard common geometric figures or shapes in two dimensional form, such as a straight line, hexagon, square, heart, or circle, because copyright law does not protect familiar symbols or designs.  C.F.R. §202.1(a).  Nonetheless, copyright protection may be available for an author who selects and arranges those shapes to create "a compilation."  In the same way, copyright protection may be available for an author who designs a complex linear grid or pattern using an arrangement of straight lines of various spacing, shading, colors and/or widths.  This creativity represents human authorship, and, if original, it is protected by copyright.

**C.      Registration of Plaids in the U.S. Copyright Office**

In preparing this supplemental report, I made a quick online search of the Copyright Office database, which includes all registrations since 1978.  In that search, I found hundreds of registrations for tartans and plaid designs, including the registration for the Burberry plaid.  Ms. Metchek is simply wrong to assert that plaid designs are uncopyrightable.  My search confirms that plaid fabric designs are routinely registered in the Copyright Office.  They represent human

Ex. 2
21

authorship, and they are copyrightable.  The Express plaids are not public domain Scottish plaids.  Their designs were all created afresh for the Express products and were registered without question by the Copyright Office.

### D. The Metchek Report on the Creativity of Plaid Designs

#### 1. *Standards of Copyrightability*

In her expert report, Ms. Metchek seems to confuse the standard of patentability with the standard of copyrightability.  To qualify for a design patent, a design must be new and unobvious.  A new work must reflect, not just a variation on a prior work, but a true "inventive step."  Because of that very high standard of inventiveness, the design patent statute has proved to be of very limited use to fabric designers.   On the other hand, to qualify for a copyright, a fabric design must only be, as noted above, original and not trivial.  The Express plaids all possess the requisite amount of creativity to qualify for copyright protection.  With those preliminary observations, I will examine several of Ms. Metchek's conclusions.

#### 2. *Selection and Arrangement Authorship*

The copyright law specifically protects "compilation" authorship, which involves the selection, coordination, or arrangement of various elements to create a new work.  A great deal of human authorship goes into the design of a plaid.  The author, among others things, creates the concept of the desired plaid, creates or selects a pattern, modifies that pattern (by adding new lines, removing existing lines, widening or narrowing certain lines, or changing its scale), decides which lines to color, chooses the colors and shadings for the various lines in the pattern, and selects the colors for the background.  Despite all of this authorship, with a wave of her hand, Ms. Metchek dismisses almost with disdain these creative contributions of the fabric

Ex. 2
22

designer.  She says that Mr. Tower, the Express designer, merely "selects" basic patterns from a pre-existing library of plaid designs, not recognizing that such selection authorship is central to copyright protection.  Striving for a stylistic effect and wanting to make a fashion statement, Mr. Tower either created new patterns or selected patterns from a library of thousands of patterns. Ms Metchek confesses that she does not know whether or not Mr. Tower modified original, or "source," plaid designs on a CAD—to make them, in her words, "wider, narrower, larger, smaller, or even take out a line or two."  I note that such "manipulation" of a source plaid also represents copyrightable authorship.  Furthermore, Ms. Metchek does not mention that an Express designer used his or her judgment to specify the placement and orientation of the plaid pattern on the garment itself, in order to create an attractive appearance.  That arrangement authorship is also eligible for copyright protection.

       After reading the deposition of Mr. Tower, I conclude that the design process was not "mechanical" or machine-driven, as Ms. Metchek contends.  In short, a great deal of human judgment went into the creation of the Express plaids and into the arrangement of the fabric in the garment, and that authorship qualifies for copyright protection.

       3.  *Re-Coloring of the Source Plaid*

       Ms. Metchek also denigrates the artistic and creative process by which the Express designer applied the new color palettes to the basic (and perhaps modified) plaid designs.  She contends that the Express designer mechanically "colored up" the source plaids utilizing "standard universal color charts for color specialists."  She does not acknowledge that those color charts contain literally thousands of choices of colors and shadings.  She also attempts to minimize the designer's creative contribution by suggesting that his color options had already been limited by the various color palette specifications that the Express executives had made at

Ex. 2

23

the highest level in fashioning their corporate image and their seasonal themes. In that regard, I make two points. First, that only a portion of the Express clothing lines followed those specified color palettes. And, second, that Ms. Metchek's observation in this regard has no relevance in copyright. Under the work-made-for-hire provisions of the copyright law, it doesn't really make any difference who in the company makes these creative choices from the thousands of options. Even if the design and color selections are a communal activity, and many employees contribute to the final product, it still enjoys full copyright protection.

Ms. Metchek asserts that the designer "mechanically" chose the colors from a library of colors and didn't mix his own colors. As a result, she contends that there is "a lack of 'pure' design creativity in the process of re-coloring open line plaids into new colorways." Again, and with all due respect, I note that Ms. Metchek confuses the copyright standard of authorship with the patent standard. Whistling past the graveyard, she states that "[c]oloring up . . . can be done by any professional in the textile field." In making that point, she confirms in my mind that color selection in and of itself is artistry of a high order, requiring the skills of a professional. The re-colorization of the source plaid is human authorship, and it is part of the artistic process that results in the creation of a copyrightable plaid design.

4. *Exhibits*

Ms. Metchek directs our attention to the exhibits that accompany her report. Throughout her report, she contends that plaids are not protected by copyright, that they are all variations on the same theme, in effect saying that "plaids are plaids" To prove her point, she references the plaids attached as Exhibit C to her report, which she describes as "a number of almost-identical open-line plaids." Her contention seems implausible on its face. Looking at the various plaid designs in Exhibit C, I am struck by their amazing variety and dissimilarity.

Ex. 2
24

### E.    Conclusion

For all of these reasons, I urge the court to put Ms. Metchek's observations in the proper

copyright context.  By doing so, the court will not relegate plaid designs to copyright Siberia.

They are a very important class of fabric designs, and they represent human, not "machine-

driven," authorship.  The U.S. Copyright Office recognized this fact by registering the Express

designs.  The opinions expressed by Ms. Metchek in her report do not reflect a sound

understanding of basic copyright principles.  These opinions appear to be her personal opinions,

and they lack foundation in the law and practice.  Be they wishful thinking or a sincere

expression of her personal preferences, I cannot judge, but they are not the views of an "expert,"

as I understand the term.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: May 21, 2010                    By: _____
                                            Ralph Oman

Ex. 1
25

# Exhibit 3

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

|  |  |  |
|---|---|---|
| EXPRESS, LLC, | ) | |
| Plaintiff, | ) ) ) ) | |
| v. | ) ) | Case No. CV09-04514 (ODW)(VBKx) |
| FOREVER 21, INC.; FOREVER 21 LOGISTICS, LLC; FOREVER 21 RETAIL, INC.; JIN SOOK CHANG; DO WON CHANG; WHITE OWL CLOTHING, INC.; STEPS APPAREL GROUP, INC. dba STEPS OF CA; and DOES 1 through 10, inclusive, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## Rebuttal Expert Report of Michael B. Mazis, Ph.D.

### June 2010

Ex. 3

26

## REBUTTAL EXPERT REPORT OF MICHAEL B. MAZIS, PH. D.

1.    I have been asked by Colucci & Umans, attorneys for the Plaintiff, Express LLC, to provide expert testimony in the above captioned case.  I have been asked to assess the scientific adequacy of a survey conducted by Thomas J. Maronick ("An Empirical Analysis of Consumers' Perceptions of Two Track Jackets") (Maronick Survey) and to prepare a report on my opinions.  A summary of my qualifications and anticipated testimony follow.

### SUMMARY OF QUALIFICATIONS AND EXPERIENCE

#### Credentials and Expertise

2.    I am Professor Emeritus of Marketing at American University's Kogod School of Business.  I was a faculty member at American University for 28 years, and I served over 10 years as chair of the marketing department.  I have taught courses in consumer behavior, marketing research, marketing principles, marketing management, Internet marketing, and marketing and public policy.

3.    I received my B.S. degree in Economics from the University of Pennsylvania, my M.B.A. degree from New York University, and my Ph.D. degree in Business Administration from Pennsylvania State University.   I was editor of the *Journal of Public Policy & Marketing* from 1992 to 1995, and I was Associate Editor of *The Journal of Consumer Affairs* from 1998 to 2001.

4.    My research interests have focused on consumer perception of advertising, labeling, and other marketing materials and on the impact of information disclosures on consumer perceptions.  I have published over 60 articles in academic journals, including *Journal of Marketing, Journal of Consumer Research, Journal of Marketing Research,*

2

Ex. 3 27

*Journal of Public Policy & Marketing, The Journal of Consumer Affairs, Journal of Personality and Social Psychology, Journal of Experimental Social Psychology,* and *Journal of the American Medical Association.* (See Exhibit A for a detailed description of my professional qualifications.)

5.      From 1976-79, I served as an in-house marketing expert at the Food and Drug Administration (FDA) and at the Federal Trade Commission (FTC), where I evaluated consumer perception of advertising and product labels and designed and conducted marketing research surveys, which included the evaluation of consumer reaction to various types of information.  I continue to serve as a consultant for the FTC, having served as the FTC's principal marketing witness in *FTC vs. Novartis* in 1997, *FTC vs. Trans Union* in 1998, *FTC vs. Mercury Marketing* in 2003, and *FTC vs. Telebrands* in 2004.  In addition, I have served as a consultant on marketing issues for the FDA, Consumer Product Safety Commission, Department of Justice, Federal Deposit Insurance Corporation, Bureau of Tobacco, Alcohol, and Firearms, U.S. Mint, and the states of California and Vermont.  (See Exhibit B for a list of cases in which I have testified in the last four years.)

## Compensation

6.      My work on this case is being billed at $600 per hour.

## Materials Considered

7.      I have considered the following documents in preparing this report:

Thomas J. Maronick, "An Empirical Analysis of Consumers' Perceptions of Two Track Jackets," May 7, 2010.

Shari Seidman Diamond, "Reference Guide on Survey Research" in *Reference Manual on Scientific Evidence, Second Edition*, Federal Judicial Center, 2000.

3

Ex. 3
28

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, 4th Edition, Thomson Publishing (hereafter "McCarthy").

First Amended Complaint and Forever 21 and Chang Defendants' Answer to Plaintiff's First Amended Complaint for Copyright Infringement, Trade Dress Infringement, and Unfair Competition.

Depositions of Randall M. Pyles, April 23, 2010 and Lawrence Meyer, January 29, 2010.

## SUMMARY OF EXPERT OPINION

8.      The Maronick Survey is unreliable because of numerous methodological defects. Thus, the conclusions in Dr. Maronick's expert report are flawed because they rest on unsound data.  Since the Express Track Jacket was sold primarily in a four-month period in early 2009, respondents would be unlikely to remember the jacket in a survey conducted a year later in April 2010.  Therefore, the survey methodology is inappropriate because it relies on an unrealistic expectation of consumer memory.  Also, the survey respondents appear to be much older than the likely jacket purchasers at Express or Forever 21.  Thus, the Maronick Survey relied on an inappropriate sampling of the universe of prospective track jacket purchasers.  Finally, the survey objective is unclear because the questions used are inconsistent with secondary meaning or likelihood of confusion questions typically used in the field.  There are additional methodological flaws discussed below that invalidate the survey's conclusions.

## MARONICK SURVEY

### Overview

9.      In the Maronick Survey, 401 male respondents who were members of a web panel were interviewed.  To qualify for participation in the survey, respondents had to have provided an affirmative answer to the question "Do you buy light-weight outerwear – jackets, windbreakers" and had to have indicated that they were either "very likely,"

Ex. 3
19

"likely," "don't know/not sure," or "unlikely" to "buy a new light-weight outerwear, i.e., jacket or windbreaker, during the next year." Respondents were shown color photographs of either the Express Track Jacket or the Forever 21 Traveler Knit Jacket.

10.     After exposure to the photographs of either the Express or the Forever 21 jacket, respondents were asked, "Do you know what retailer sells this jacket?" Respondents who indicated that they knew what retailer sells the jacket were asked (in an open-ended question and in a closed-ended question) to indicate the name of the retailer that sells the jacket. Respondents were asked also to indicate the retailers that they shop at for jackets or windbreakers. In addition, respondents supplied demographic information about their age and education.

### Critique of Maronick Survey

**Inappropriate Time Frame**

11.     The Track Jacket was sold in Express stores from December 2008 to November 2009. However, most of the sales were in the first four months of 2009.[1]  Since the Express Track Jacket was sold primarily in a four-month period in early 2009, respondents would be unlikely to remember the jacket in a survey conducted a year later in April 2010. Therefore, the survey methodology is inappropriate because it relies on an unrealistic expectation of consumer memory.

**Inappropriate Universe**

12.     The "Reference Guide on Survey Research" (one of the chapters in the *Reference Manual on Scientific Evidence)* discusses a number of key issues to consider when determining the probative value of a survey. One important consideration is the survey universe or population. Properly defining the survey universe is important because as the

---

[1] Deposition of Randall M. Pyles, April 23, 2010 at 68-69, 82, and Exhibit 85.

Ex. 3
20

*Reference Guide* observes: "The definition of the relevant population is crucial because there may be systematic differences in the responses of members of the population and nonmembers."[2]

13.     In the Maronick Survey, respondents could qualify for survey participation even if they answered "don't know/not sure" or "unlikely" to "buy a new light-weight outerwear, i.e., jacket or windbreaker, during the next year." Fifty-seven (14%) of 401 respondents who answered "don't know/not sure," or "unlikely" should have been excluded from the survey because they did not indicate that were likely prospective jacket purchasers in the next 12 months. Thus, one problem with the universe in the Maronick Survey is that it is overinclusive.[3]

14.     Even more troubling is that more than one-quarter (26%) of those interviewed were over 50 years of age and 41% were over 40 years of age. Only 25% of respondents were 30 years of age or younger. However, the primary target market for Forever 21 consists of much younger consumers. About 65% of Forever 21's customers are 24 years of age or younger.[4] Therefore, the survey population is likely much older than would be appropriate for such a survey.

## Value of Maronick Survey to Current Litigation is Unclear

15.     The stated goal of the Maronick Survey was to "assess the extent to which consumers are able, if at all, to identify the makers of two somewhat similar men's outdoor jackets formerly sold in the respective retailer's stores, namely Express and Forever 21." Such a goal is not consistent with the key issues of likelihood of confusion and secondary meaning identified in the First Amended Complaint.

---

[2] Shari Seidman Diamond, "Reference Guide on Survey Research" in *Reference Manual on Scientific Evidence, Second Edition*, Federal Judicial Center, 2000 at 240 (hereafter referred to as *Reference Guide*).
[3] *Reference Guide* at 241.
[4] Deposition of Lawrence Meyer, January 29, 2010 at 15:12-14.

Ex.3
21

16.     A proper survey to assess likelihood of forward confusion would have focused on the junior user's (Forever 21) target audience. *McCarthy on Trademarks and Unfair Competition* indicates that

> Forward confusion will be likely to occur when a person who knows of the senior user first comes into contact with the junior user's mark, and because of the similarity of marks, mistakenly thinks that the junior user is the same as or is affiliated or connected with the senior user.[5]

McCarthy goes on to note that

> In a traditional case claiming "forward" confusion, not "reverse" confusion, the proper universe to survey is the potential buyers of the *junior user's* goods or services.[6]

Therefore, if Maronick Survey were designed to assess forward confusion, the survey population should have consisted solely of likely Forever 21 outdoor jacket purchasers. Typically, respondents would be shown the trade dress of the junior mark and not shown the trade dress of the senior mark.  Also, the standard practice in likelihood of confusion surveys is to include questions to determine whether consumers believe that there is a connection or association between the seller of the Forever 21 Traveler Knit Jacket and some other seller (e.g., Express).  It is also standard practice in likelihood of confusion surveys to include questions to determine whether consumers believe that the seller of the Forever 21 Traveler Knit Jacket had obtained permission or approval from some other seller (e.g., Express).  These are standard topics typically included in likelihood of confusion surveys exploring potential Lanham Act violations that were not included in the Maronick Survey.

16.     A survey designed to assess secondary meaning would typically involve exposing respondents to the senior mark to determine whether respondents associate the trade dress

---

[5] J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, 4th Edition, Thomson Publishing, 23:10, 23-37 (hereafter "McCarthy").
[6] *Id.* at 32:159, 10.

Ex.3
22

of the senior mark with a single source.  It is not necessary for respondents to know the

identity of that source.

> All that is necessary to establish a secondary meaning is that the ordinary
> buyer associates the mark with a single, albeit anonymous source.  The
> buyer need not know the corporate or personal name of the source.[7]

However, the Maronick Survey failed to ask questions typically included in a secondary

meaning survey to determine whether consumers identified the trade dress of the Express

Track Jacket with a single source.  Instead, respondents were asked to identify the retailer

that "sells this jacket."

## CONCLUSIONS

17.    The Maronick Survey is fatally flawed because of numerous defects.  The survey

results cannot be relied upon as a result of these significant methodological flaws.


_Michael B. Mazis_                    _May 28, 2010_
**Michael B. Mazis, Ph.D.**                        **Date**


---

[7] *Id.* at 15:8, 15-16.

Ex. 3
22

# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

EXPRESS, LLC )
)
)
Plaintiff, )
)
v. )   Case No.:  CV09-04514(ODW)(VBKx)
)
FOREVER 21, INC., ET AL. )
)
Defendants )
)

## SECOND SUPPLEMENTAL EXPERT REPORT OF RALPH OMAN

I have been retained by the attorneys for plaintiff Express, LLC, to serve as an expert witness, and as a testifying expert witness.  On May 10, 2010, I submitted an expert report pursuant to Fed. R. Civ. P. 26(a)(2).  In that report, I reserved the right to supplement or amend that report pursuant to Fed. R. Civ. P. 26(e) if additional information affecting my opinion became available.  On May 21, 2010, I submitted a supplemental and rebuttal report in response to the expert report of defendants' witness, Ilse Metchek.  I have just read the expert report of defendants' witness, Bernard C. Dietz, Esquire, and I submit this second supplemental expert report in response to several points Mr. Dietz makes in his report.

### A.   Copyrightability of the Express Plaid Designs

I note at the outset that Mr. Dietz, unlike Ms. Metchek, agrees with my view that plaid designs enjoy full copyright protection, if original and non-trivial.  Nonetheless, Mr. Dietz makes two points that require a further response.

E_x. 4
24

First, he suggests that the Express plaid fabric designs used for its garments are not original—that the grid patterns were copied from preexisting designs, and that the "colorups" were somehow dictated by a color chart that made the selection of colors mechanical rather than creative. In other words, he contends that the Express plaids are "off-the-shelf", ordered from a textile manufacturer's sample book, without any input from the Express designers. In support of this thesis, he quotes out of context a statement made by Michael David Tower in his deposition testimony. Mr. Tower was asked: "Does anybody at Express design fabrics?" In response, he said: "We don't have any design fabric people. We have fabric people, but we don't design our own fabrics. Textile mills take care of that." Rough Deposition Transcript of Michael Tower ("Transcript"), at 113.

My reading of the full transcript leads me to a contrary conclusion—that a great deal of human authorship in the Express organization went into the design of the plaid fabrics at issue in this case. As Mr. Tower explains later in his testimony, "I come up with something. [A] pattern[.] I meet with my CAD person. We both work with getting that plaid to what we're trying to achieve and that's how it starts." Transcript at 119. He continues: "We start from scratch. . . I have a tear sheet, . . . a photo . . . a visual reference that we begin with . . . and that's how the process begins." Transcript at 120. As I noted in my First Supplemental and Rebuttal Report, the author, with his CAD person, starts with a concept of the desired design. The author then refines and modifies that concept (e.g., by adding new lines, removing existing lines, widening or narrowing certain lines, and changing its scale to achieve the desired effect). He then decides which lines to color, chooses the colors and shadings for those lines, and then selects the colors for the background. Mr. Tower, a man of significant design experience who seeks inspiration for his fashion concepts from many sources, used his judgment to make all of

Ex. 4
35

these creative decisions to achieve a stylistic objective with the perfect plaid for the garment he designed. He also determined how to orient the plaid design into the garment to make a fashion statement. All of this creativity is copyrightable authorship, and the fact that the Copyright Office issued the registration certificates indicates that the expert agency recognized Mr. Tower's (and the rest of the Express design team's) authorship.

### B.      Fraud on the Copyright Office

The second point raised by Mr. Dietz that requires a response is more troubling. He raises the specter of fraud on the Copyright Office, which is a very serious charge. The Copyright Office and the courts apply a very strict standard before leveling a charge of fraud. A misrepresentation or omission in the application constitutes fraud only if it is material and only if it were knowingly done to secure registration for a work that the Copyright Office, if it had known the truth, would have otherwise refused to register. Therefore, I disagree with Mr. Dietz's judgment that Mr. Colucci somehow misled the Copyright Office by leaving Screen Four blank. In my experience, Screen Four is used to identify a specific pre-existing work on which the new work is based, or is derived from. Screen Four has no relevance to the Express registration applications for the original plaid designs in this case. Obviously, they incorporate some of the normal attributes of a plaid, with horizontal and vertical lines, but they are not based on an identifiable pre-existing work. They were inspired by multiple sources, as indicated by Mr. Tower. As a general rule, authors are not expected to list on Screen Four all of the multiple sources of inspiration that resulted in the new work, normally an impossible task. In my opinion, it would have been inaccurate and misleading to have indicated any specific source on Screen Four, when there is no such a source. Under the circumstances, Mr. Colucci was correct in

Ex. 4
36

leaving Screen Four blank. I have not researched the archive of Copyright Office registration certificates for plaid designs, but I am confident that such a search would indicate that very few plaid registrations reference "source" plaids on Screen Four, even if those new designs had in some way been "inspired" by pre-existing designs. No one was misled by Mr. Colucci, and the insinuation of fraud is misplaced.

I also note in a related connection that a lawyer who signs a copyright registration application and submits it to the Copyright Office on behalf of a client cannot, and should not, be expected to somehow guarantee the accuracy of the information that he or she has been provided by the client-author. Only the author knows the details of the creativity, and the lawyer must rely on the author's honesty and accuracy in completing the application on the author's behalf. I note that the Copyright Office, to promote efficiency of the copyright registration process, encourages electronic filing by lawyers on behalf of their clients, and the Copyright Office regulations specifically authorize the author's agent to fill out the application form. Mr. Colucci acted correctly in this case in doing so. In my experience, I know of no case where a lawyer who filed an application on behalf of a client was held liable for making a fraudulent filing in the Copyright Office because he or she relied on information supplied by the client. I should emphasize, for the reasons stated above in the discussion of fraud, that the Express copyright applications in my opinion do not contain *any* misstatements or omissions, let alone any that would in any way reflect adversely on the integrity of Mr. Colucci. That would be true even if he were in some way warranting the accuracy of the information on the applications, which he is not.

**C.     Conclusion**

Ex. 4

27

202 994 7777        GWU Faculty F415          GWU Faculty F415          06:06:53 p.m.    06-10-2010          2/2

The Express plaids reflect the professional judgments of an experienced designer who

created distinctive and original plaid designs that have met with commercial success.  The

registration certificates at issue in this case were not secured by fraud, and they entitle the

Express plaid designs to *prima facie* copyright validity.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: June 10, 2010                     By:
                                        Ralph Oman

- 5 -

Ex. 4

38

# Exhibit 5

Express, LLC v.
Forever 21, Inc.

Michael Tower
April 22, 2010

---

**Page 1**

```
 1            UNITED STATES DISTRICT COURT
 2            CENTRAL DISTRICT OF CALIFORNIA
 3                  WESTERN DIVISION
 4
 5
 6   EXPRESS, LLC,                :
 7                                :
 8            Plaintiff,          :
 9                                :   Civil Action Number
10        v.                      :   2:09-CV-04514-ODW-VBK
11                                :
12   FOREVER 21, INC.; FOREVER    :      (4-23-10)
13   21 LOGISTICS, LLC;           :
14   FOREVER 21 RETAIL, INC.;     :
15   JIN SOOK CHANG; DO WON       :
16   CHANG; WHITE OWL CLOTHING,   :
17   INC.; STEPS APPAREL GROUP,   :
18   INC. d/b/a STEPS OF CA;      :
19   and DOES 1 through 10,       :
20   inclusive,                   :
21                                :
22            Defendants.         :
23   _____
24
25
```

**Page 2**

```
 1        Deposition of MICHAEL TOWER taken on
 2   behalf of the Defendants at the offices of POWLEY &
 3   GIBSON, P.C., 304 Hudson Street, New York, New
 4   York, on Thursday, April 22, 2010, commencing at
 5   1:03 in the afternoon before PATRICIA MULLIGAN
 6   CARRUTHERS, a Certified Shorthand Reporter and
 7   Notary Public of the State of New Jersey and Notary
 8   Public of the State of New York.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1   A P P E A R A N C E S :
 2
 3   COLUCCI & UMANS
 4   218 East 50th Street
 5   New York, New York  10022
 6   (212) 935-5700
 7   BY:  FRANK J. COLUCCI, ESQ.
 8        fcolucci@colucci-umans.com
 9        MICHAEL J. PAMPALONE, III, ESQ.
10        mpampalone@colucci-umans.com
11   Attorneys for the Plaintiff
12
13   RUSS AUGUST & KABAT
14   12424 Wilshire Boulevard
15   Los Angeles, California  90025
16   (310) 826-7474
17   BY:  LARRY C. RUSS, ESQ.
18        lruss@raklaw.com
19   Attorneys for the Defendants
20
21
22
23
24
25
```

**Page 4**

```
 1              I N D E X
 2
 3   WITNESS                           PAGE
 4   MICHAEL TOWER
 5   By Mr. Russ                         5
 6
 7
 8         REQUESTS FOR PRODUCTION
 9              PAGE      LINE
10               78        6
11
12
13            E X H I B I T S
14   NUMBER      DESCRIPTION           PAGE
15   80     Six CAD Forms                71
16          (Bates Nos. EXP 0064 - 0069)
17          Twelve Pictures of Jackets
18          (No Bates Nos.)
19
20
21
22
23
24
25
```

29  Ex.5

Michael Tower
April 22, 2010

Express, LLC v.
Forever 21, Inc.

---

**Page 13**

1  specific item.  You kind of design a concept of
2  what the line is going to look like or a concept of
3  what the line should look like?
4      A.    We design the line.  Right.  Yes.
5      Q.    So give me an example of something
6  when you were at Ralph Lauren, something that you
7  designed.
8      A.    Outerwear pieces, knits, woven
9  shirts, belts, graphic Ts.
10     Q.    Let's take a shirt that you
11 designed.  Walk me through the process.  What --
12 tell me what you did to design it.
13     A.    Graphic shirt, for instance.
14 Photographs, images within the concept that we're
15 working on.  Put those together.  We screen-print
16 something onto them.  We give them an ideal.  Ralph
17 comes in.  He takes a look at it.
18     Q.    And then that goes somewhere else
19 to have it actually made.
20     A.    I don't understand that question.
21     Q.    In other words, once your concepts
22 are approved, somebody takes your concepts and puts
23 it into reality --
24     A.    We then work with designers.  We
25 sit down with each designer.

---

**Page 14**

1      Q.    So you work with other designers
2  to actually draw something or put something
3  together to make a sample?
4      A.    Uh-huh.  Yes.
5      Q.    So you're not the person that does
6  the drawing or --
7      A.    No.
8      Q.    You come up with a concept?
9      A.    Correct.  Yes.
10     Q.    So when you were at Ralph
11 Lauren -- And we were talking about plaids. -- you
12 do a rig.  You kind of find some plaids that you
13 like, put it in a picture, put it together with a
14 bunch of different things that you find would go
15 together, and you would make a presentation.  Is
16 that about right?
17     A.    Yes.
18     Q.    And where would you get the
19 pictures of the plaids from?
20     A.    Photographs, tear sheets,
21 archives, garments.
22     Q.    What kind of archives would you
23 look at?
24     A.    Go to the national history museum,
25 talk to -- I don't know.  Lodges.  If it was in the

---

**Page 15**

1  northwest, I would call up Seattle, old libraries
2  and get photographs.
3      Q.    Does Ralph Lauren have any kind of
4  library stuff that it's already done or used in the
5  past?
6      A.    Can you be more specific?
7      Q.    In other words, if you wanted --
8  when you were at Ralph Lauren, if you wanted to see
9  plaid it had already introduced into the market,
10 would you be able to do that?
11     A.    Yes.  I think so.
12     Q.    Okay.  So then we go to
13 Abercrombie for a year.  What was your role?
14     A.    I designed bottoms.
15     Q.    And when you say you designed
16 bottoms, was your role the same as it was at Ralph
17 Lauren in terms of you basically put together the
18 concept, and then somebody else did the actual
19 drawings?
20     A.    No.
21     Q.    Okay.  Tell me how your role was
22 different in Abercrombie?
23     A.    Just from start to finish, I was a
24 true designer for bottoms.
25     Q.    Which means you came up with the

---

**Page 16**

1  concept.  You did the drawing, and you -- up to the
2  time that you got an actual sample -- made up
3  something that you had envisioned.
4      A.    Yes.
5      Q.    And in terms of the way that you
6  would create the bottoms that you ended up creating
7  when you were at Abercrombie, did you do the same
8  things you did at Ralph Lauren in terms of getting
9  inspiration from other sources?
10     A.    No.
11     Q.    How did you go about doing things
12 at Abercrombie?
13     A.    The two companies were set up
14 completely different from one another, actually --
15 from a design point, actually.  Ralph is a very
16 design-oriented company; Abercrombie is a little
17 bit different.
18     Q.    Tell me what the differences are
19 in terms of the design orientation.
20     A.    The stress at Abercrombie wasn't
21 so much rig presentations, concept.
22     Q.    How do you spell "rig," by the
23 way?
24     A.    R-I-G.
25     Q.    Does "rig" stand for anything?

---

**Barkley Court Reporters**

Min-U-Script®

Ex.5
40

Express, LLC v.
Forever 21, Inc.

Michael Tower
April 22, 2010

Page 17

1    A.    We just -- That's just a Ralph
2  term. I don't know. It was there when I got
3  there. It basically means concept.
4    Q.    At Abercrombie, what was the
5  process that you went through to design a bottom,
6  generally?
7    A.    Again, inspirations, tear sheets,
8  magazines. We traveled. People took pictures.
9  There's a concept team. They took pictures. Kids
10  wearing clothes. Basically everywhere, newspapers,
11  any kind of media basically, and also garments,
12  too.
13    Q.    So you take pictures of things
14  that you saw people wearing?
15    A.    Not me.
16    Q.    Or somebody would. Did you do any
17  Internet research?
18    A.    Yeah. Of course.
19    Q.    Did you go into any stores, any
20  cool stores that you liked just to kind of get
21  inspiration from that?
22    A.    Sometimes.
23    Q.    Did you ever buy things in stores?
24    A.    Sometimes.
25    Q.    So when you said it wasn't you

Page 18

1  that took the photos, you would go with a team to
2  go look at things?
3    A.    No.
4    Q.    Walk me through the process.
5    A.    Sure. Concept team takes care of
6  all of that stuff.
7    Q.    Now we're talking about
8  Abercrombie?
9    A.    Yes.
10    Q.    There's a concept team?
11    A.    There's a person.
12    Q.    Was that person you?
13    A.    No.
14    Q.    So there's a concept person, and
15  the concept gets inspiration from various sources.
16  Right?
17    A.    Right.
18    Q.    Then what happens next?
19    A.    Then they present to the full
20  team, basically.
21    Q.    And they present like a storyboard
22  of concepts?
23    A.    Yeah. With -- just visual
24  displays, basically.
25    Q.    Visual displays with photos and

Page 19

1  material samples and --
2    A.    Yes.
3    Q.    And then what happens? What
4  happens with respect to your involvement at that
5  point?
6    A.    After that basically, then it's up
7  to the designers to design into those categories,
8  basically.
9    Q.    Okay. So from that point, you do
10  drawings of an actual garment?
11    A.    No.
12    Q.    And you also design what the
13  fabric is going to look like?
14    A.    Yes.
15    Q.    That's when you were at
16  Abercrombie?
17    A.    Yes.
18    Q.    When you were at Abercrombie, did
19  you do any plaid designs for bottoms?
20    A.    No.
21    Q.    And you were at Abercrombie for
22  about a year?
23    A.    Uh-huh.
24    Q.    And then you went to American
25  Eagle?

Page 20

1    A.    Yes.
2    Q.    And what was your role at American
3  Eagle?
4    A.    I did concept.
5    Q.    So in that sense, you weren't what
6  you call a true designer when you were at American
7  Eagle?
8    A.    I'm not sure what that means.
9    Q.    I thought you used "true designer"
10  when you were talking about Abercrombie as soup to
11  nuts, from concept to the drawings to the --
12    A.    Yes. I guess that's a fashion
13  designer.
14    Q.    So at American Eagle, that wasn't
15  your role?
16    A.    Concept design.
17    Q.    At American Eagle, you were a
18  concept designer, which means you came up with the
19  concept. Somebody else did the drawings and --
20    A.    Yes.
21    Q.    You have to let me finish my
22  question; otherwise, she's not going to get my
23  whole question. A lot of the questions I'm going
24  to ask are going to be obvious, and I know you're
25  going to anticipate where I'm going. Even though

Ex.5

41

Express, LLC v.
Forever 21, Inc.

Michael Tower
April 22, 2010

---

Page 41

```
 1    basically.
 2        Q.      And what about the material that
 3    the garment is being made out of?  How does that
 4    come to be?
 5        A.      Fabric people.
 6        Q.      You meet with the fabric people?
 7        A.      Yes.
 8        Q.      What goes on?  How does that work?
 9        A.      Just general meeting with my
10    person.  I know exactly what kind of fabric I'm
11    looking for to get.  I meet with them.  They meet
12    with mills -- actually, they contact the mills.
13    The mills come in.  We meet with them.
14        Q.      So there are some fabric mills
15    that you deal with on a regular basis?
16        A.      Yes, there are.
17        Q.      Does Express contract out
18    manufacturing to other sources?
19        A.      I don't know what you mean.
20        Q.      Express doesn't manufacture its
21    own products, does it?
22        A.      No.
23        Q.      So it hires third parties to
24    manufacture the products?
25        A.      Yes.
```

---

Page 42

```
 1        Q.      Do you deal directly with any
 2    manufacturers?
 3        A.      No.
 4        Q.      Do you deal directly with any
 5    agents?
 6        A.      No.
 7        Q.      So once your design is approved,
 8    it goes to somebody else to carry it through to an
 9    actual product?
10        A.      There's a process.  Absolutely.
11        Q.      So on your board you presented,
12    let's say, several different shorts with different
13    designs on them from photos or something else that
14    you got, either a sample or photo or whatever.
15        A.      Yes.
16        Q.      Then you give that to the fabric
17    people, and you say, Can you find this kind of
18    stuff?
19        A.      Again, it's a process.  How it
20    kind of works, I design into something.  I kind of
21    have a process of what kind of fabric it's going to
22    be in, and it all kind of rolls together,
23    basically.
24        Q.      What I'm trying to figure out is
25    how detailed -- what do you give to the fabric
```

---

Page 43

```
 1    people to go to the next step?  Do you give them a
 2    drawing?  Do you give them just a concept or
 3    picture or something?
 4        A.      No.
 5        Q.      What do you give them?
 6        A.      The fabric people?  I don't give
 7    them anything.
 8        Q.      You just say, I want a fabric that
 9    is like the picture that I showed you or --
10        A.      No.
11        Q.      Well, how do they know what to get
12    you?
13        A.      Because I give them specific
14    instructions of what I'm looking to get.
15        Q.      So let's take a plaid short.
16        A.      Okay.
17        Q.      So you decided that you're going
18    to introduce a plaid short.  You have the
19    storyboard.  It has a silhouette, a drawing, some
20    samples, the fabric swatches, whatever.  Everybody
21    says, Yeah, these are cool.  Let's go with these.
22    And you meet with the fabric people.
23        A.      Okay.
24        Q.      Then what happens?  Do you give
25    them a drawing of the --
```

---

Page 44

```
 1        A.      I don't give my fabric people
 2    drawings.
 3        Q.      All right.  How do they know what
 4    kind -- let's say you want a plaid.  How do they
 5    know what kind of plaid you want?
 6        A.      Who?
 7        Q.      The fabric people.
 8        A.      I don't give plaids to the fabric
 9    people.  They're fabric people.  That's what they
10    do.  They deal with fabric.
11        Q.      Okay.  When I say "fabric," I mean
12    the material that the shorts are being made of.
13        A.      I know what you mean by fabric,
14    actually.  I don't give them -- I don't work with
15    them with plaids.  They work with fabric.  If I
16    want a three by one twill, 120 by 164, I'll get
17    that, actually.
18        Q.      So let's talk about the design
19    that's on the fabric.
20        A.      Okay.
21        Q.      How does that work?
22        A.      I come up with something.  I come
23    up with a -- a -- a pattern.  I meet with my CAD
24    person.  We both work with getting that plaid to
25    what we're trying to achieve, and that's how it
```

---

Ex. 5

42

Michael Tower
April 22, 2010

Express, LLC v.
Forever 21, Inc.

Page 45

1    starts.
2        Q.    Okay.  So you have a concept in
3    your head about the plaid or what you want to
4    achieve, and you work with a CAD person to create
5    something on the CAD machine?
6        A.    Yes.
7        Q.    Do you know what kind of a CAD
8    machine you guys have?
9        A.    No.  I don't know what you mean by
10   that, actually.  What kind of computer he works on
11   or what is the CAD machine he works on, because you
12   have to be more specific, please.
13       Q.    What is a CAD machine?
14       A.    It's a CAD machine that prints off
15   the CADs.
16       Q.    Do you know what "CAD" stands for?
17       A.    No.
18       Q.    Computer-assisted design.
19   Do you know whether there's a
20   program that your CAD designer works with?
21       A.    No.
22       Q.    You don't know.
23       A.    Illustrator and Photoshop.
24       Q.    Do you know what -- whether
25   there's any designs that are preloaded on the

Page 46

1    computer for the CAD to work with?
2        A.    No.
3        Q.    You don't know?
4        A.    No.
5        Q.    I want to make sure I understand
6    your answer.  You don't know one way or another
7    whether there are any preloaded designs on the CAD
8    program that your CAD people work with.
9        A.    Sorry.  I don't understand the
10   question.  What does "preloaded" means?  I know
11   what preloaded means, but I'm not sure what you --
12       Q.    In other words, let's say you want
13   to work on a plaid.
14       A.    Okay.
15       Q.    And you're going to your CAD
16   designer, and you go, Okay, I'm thinking about a
17   plaid.  Show me some plaids.  I want to mess around
18   with some plaids.  Does the CAD have any plaids on
19   the CAD to work with to begin with?
20       A.    Not that I know of.
21       Q.    As far as you're concerned, the
22   CAD designer has to start from scratch?
23       A.    I'm sorry.  For what?
24       Q.    To design a plaid.
25       A.    Yeah.  We start from scratch.

Page 47

1    Yeah.  I think you're confused by the process,
2    actually.  Basically, I have -- it doesn't come in
3    my head, actually.  I have a -- whether it's a
4    picture, whether it's a garment, whether it's a
5    tear sheet, whether it's a photo.  I start with
6    something like that, basically.
7        So there's a visual reference that
8    we begin with, and then I meet with my CAD
9    designer, and that's how the process begins.
10       Q.    If there's a visual reference,
11   what you're saying is -- let's say there's a plaid
12   that you saw that you liked.
13       A.    Right.
14       Q.    And you give it to the CAD
15   designer, and you say, I want to do something like
16   this, but I want to change certain things about it.
17   Is that what you're doing?
18       A.    That's how it begins.
19       Q.    So you start with something that
20   you've seen somehow, either a drawing, a picture,
21   an actual garment, something?
22       A.    Yes.
23       Q.    Okay.  In connection with any of
24   the items that you've designed, other than the
25   shorts involved in this case, do you know whether

Page 48

1    any copyright registrations have been filed for any
2    of your designs?
3        A.    No.
4        Q.    You don't know or -- It's not a
5    good question.
6        A.    Sorry.  Can you repeat the
7    question, please.
8        Q.    Can you identify any garments that
9    you designed that Express filed a copyright
10   registration on, other than the shorts involved in
11   this case?
12       A.    No.
13       Q.    Have you ever had any
14   conversations with anybody at Express about whether
15   or not to copyright any of your designs?
16       A.    Can you provide a time frame?
17   Like when?
18       Q.    Ever, while you were at Express.
19       A.    No.
20       Q.    Never had a conversation with
21   anybody?
22       A.    No.  I'm a designer.
23       Q.    Were you told that the shorts that
24   you worked on that are at issue in this case were
25   going to be registered as -- for copyright

Ex.5

43

Michael Tower
April 22, 2010

Express, LLC v.
Forever 21, Inc.

Page 53

1    Q.    Do you remember how you came up
2  with the concept, how -- what the process was from
3  start to beginning to the point that a sample was
4  previewed?
5    A.    It's all the same, actually.
6    Q.    Okay.  So take me through it.
7    A.    It's very easy, actually.  We
8  start -- This is how the process works:  We start.
9  We come up with inspiration, whether it's a tear
10  sheet, whether it's a photograph, whether it's a
11  garment.  It can be any of those.  I basically get
12  that.  I start with that.  I use it for
13  inspiration.  I like it.  I meet with my CAD
14  designer.  We talk about a couple of things, how we
15  want to reengineer it, redesign it, and basically,
16  that's how the process begins, basically.
17    Q.    So in this case, you started out
18  with pictures or swatches of some plaids along with
19  pictures of shorts.  That was your original concept
20  before you went to go talk to the CAD designer?
21    A.    Yes.
22    Q.    Okay.  And then you would show the
23  CAD designer the swatches and photos or whatever
24  you used for inspiration, you showed that to the
25  CAD designer?

Page 54

1    A.    Yes.
2    Q.    And then you would collaborate
3  with the CAD designer to do what?  What does the
4  CAD designer do?
5    A.    What does the CAD designer do?
6    Q.    Yes.
7    A.    He -- He takes the pattern that I
8  tell him, that I give him instructions on, and he
9  renders that for us.
10    Q.    So he takes the pattern that you
11  show him, and he basically creates that on his CAD
12  machine?
13    A.    Yes.
14    Q.    Okay.  And then what happens?  He
15  creates it on the CAD machine.  What does he do
16  with it?  He shows it to you?
17    A.    Uh-huh.
18    MR. COLUCCI:  You have to say
19  "yes."
20    A.    Yes.
21    Q.    Then what happens?
22    A.    Then I take a look at it, and if
23  I'm happy with it, I begin to do colorups with it.
24    Q.    What does that mean, to do
25  colorups?

Page 55

1    A.    Well, we have color stories for
2  seasons.
3    Q.    So what you mean is, you're using
4  specific colors with a whole group of items, and
5  you want the colors to be consistent?
6    A.    I don't understand the question.
7    Q.    Maybe you can explain what you
8  just said before:  We do colorups.
9    A.    We do colorups for that particular
10  season, yes.
11    Q.    What does that mean when you do
12  colorups --
13    A.    I'll color up the CAD myself.
14    Q.    Let's go backward to a colorup for
15  the season.  What does that mean?
16    A.    It means coloring -- taking the
17  CAD and putting colors into that CAD.
18    Q.    Forget about the CAD for a second.
19  You say you do colorups for the season.  What does
20  that mean?  You're basically -- the line that
21  you're introducing during the course of this season
22  are going to follow certain color patterns that
23  you've selected for the season?
24    A.    Yes.
25    Q.    Okay.  That's what I want to make

Page 56

1  sure of.
2    So you already have a concept in
3  your head or that the design team has agreed upon
4  that these are, like, the colors that you're going
5  to use, more rust or more browns or whatever
6  colors --
7    A.    Yes.
8    Q.    And so then you go to the CAD
9  machine -- if he comes up with a rendering that you
10  like, then you take it, and you color it up
11  yourself?
12    A.    No.
13    Q.    All right.  What happens after he
14  shows you a design that you like?
15    A.    I give him instructions of how to
16  color up the CADs.
17    Q.    Okay.  Walk me through the
18  instructions.  What kind of instructions do you
19  give him?
20    A.    I take out a piece of paper that's
21  been formatted for the CAD person, and I fill it
22  out accordingly to how I want each CAD to be
23  colored up.
24    Q.    I see.  So the form that you have
25  has colors on them, and you check the boxes?

Ex.5
44

Michael Tower
April 22, 2010

Express, LLC v.
Forever 21, Inc.

Page 61

1    short. I like this fabric. I like the design of
2    this plaid. Put something like this up on the CAD.
3            Are you with me so far?
4        A.    Kind of. Yeah.
5        Q.    And he renders this on the CAD.
6        A.    Okay.
7        Q.    And suppose you want to change
8    something of his rendering. What do you do?
9        A.    I give him directions if I change
10   that before he even starts to design within the
11   CAD.
12       Q.    So if you had a short like this,
13   you would say, I want you to do a rendering of
14   this, but I want you to move the boxes. I want the
15   boxes wider or the lines narrower. I want this
16   line over here, that line over there?
17       A.    I design into any inspiration that
18   I'm using for that CAD, and I pass that on to him.
19       Q.    And how do you do that?
20       A.    Through communication.
21       Q.    Oral or in writing?
22       A.    Oral.
23       Q.    So you're standing over his
24   shoulder, and you tell him?
25       A.    Uh-huh.

Page 62

1            MR. COLUCCI: Say "yes."
2        A.    Yes.
3        Q.    You've got a fabric swatch or a
4    picture or an actual sample of something, and you
5    say, I want to do a rendering of this, but I want
6    you to do this and that differently. And you're
7    telling him orally while he's putting it up on the
8    CAD?
9        A.    Yes.
10       Q.    Is that the way you always do it?
11       A.    I've always done it that way.
12       Q.    In connection with Exhibit -- I
13   think this is 14. Do you remember what you showed
14   the CAD designer, the CAD person, to create this
15   particular plaid?
16       A.    No.
17       Q.    Okay. You don't remember whether
18   it was a fabric swatch?
19       A.    No.
20       Q.    You don't remember whether it was
21   an actual pair of shorts?
22       A.    No.
23       Q.    You don't remember if it was a
24   photograph of something?
25       A.    No.

Page 63

1        Q.    But you do remember that you did
2    show him something?
3        A.    Yes.
4        Q.    Was the CAD person, by the way, a
5    male or a woman?
6        A.    A man.
7        Q.    Who was that person?
8        A.    What do you mean?
9        Q.    The name of that person.
10       A.    Ed.
11       Q.    Ed what?
12       A.    Field.
13       Q.    F-I-E-L-D?
14       A.    That's right.
15       Q.    So you showed Ed something, but
16   you don't remember what it was?
17       A.    Yes.
18       Q.    And then Ed did a rendering on the
19   CAD?
20       A.    Uh-huh.
21       Q.    Do you remember what specific
22   changes you told Ed to make from the original thing
23   that you gave him, that you showed him?
24       A.    For this short, in particular?
25       Q.    Yes.

Page 64

1        A.    No.
2        Q.    So you don't remember any specific
3    design changes that you made.
4        A.    For this short, no.
5        Q.    I'm going to ask the same question
6    for all of these shorts. Let's start with
7    Exhibit 12. I'm assuming you went through the same
8    process. You showed Ed something. You did a
9    rendering on the CAD. You told him what you want
10   changed. Right?
11       A.    That's correct.
12       Q.    Do you remember with respect to
13   Exhibit 12 what you told him to change?
14       A.    No.
15       Q.    How about Exhibit 11? You showed
16   Ed something that he did a rendering on, and you
17   told him to change something. Right?
18       A.    Yes.
19       Q.    Do you remember what you told him
20   to change on Exhibit 11?
21       A.    No.
22       Q.    How about Exhibit 8? You showed
23   Ed something. You told him to do a rendering.
24   Right?
25       A.    Yes.

Ex.5
45

1                   C E R T I F I C A T I O N

2

3           I, PATRICIA MULLIGAN CARRUTHERS, a

4   Certified Shorthand Reporter and Notary Public of

5   the State of New Jersey and a Notary Public of the

6   State of New York, do hereby certify that prior to

7   the commencement of the examination the witness was

8   sworn by me to testify as to the truth, the whole

9   truth, and nothing but the truth.

10          I do further certify that the foregoing is

11  a true and accurate transcript of the testimony as

12  taken stenographically by and before me at the

13  time, place, and on the date hereinbefore set

14  forth.

15          I do further certify that I am neither of

16  counsel nor attorney for any party in this action

17  and that I am not interested in the event nor

18  outcome of this litigation.

19

20          Patricia Mulligan Carruthers, CSR
            Certificate No. XI00780
21          Notary Public of the State of New York
            Notary Public of the State of New Jersey
22

23  Dated:   May 5th, 2010

24

25  My commission expires October 23, 2010.   (N.J.)
    My commission expires October 04, 2009.   (N.Y.)
                         79

Ex. 5
46

# Exhibit 6

Express, LLC v.
Forever 21, Inc.

Randall M. Pyles
April 23, 2010

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3                    WESTERN DIVISION
 4
 5
 6   EXPRESS, LLC,                  :
 7                                  :
 8          Plaintiff,              :
 9                                  :  Civil Action Number
10       v.                        :  2:09-CV-04514-ODW-VBK
11                                  :
12   FOREVER 21, INC.; FOREVER     :      (4-23-10)
13   21 LOGISTICS, LLC;            :
14   FOREVER 21 RETAIL, INC.;      :
15   JIN SOOK CHANG; DO WON        :
16   CHANG; WHITE OWL CLOTHING,    :
17   INC.; STEPS APPAREL GROUP,    :
18   INC. d/b/a STEPS OF CA;       :
19   and DOES 1 through 10,        :
20   inclusive,                    :
21                                  :
22          Defendants.            :
23   _____
24
25
```

Page 2

```
 1          Deposition of RANDALL M. PYLES taken on
 2   behalf of the Defendants at the offices of POWLEY &
 3   GIBSON, P.C., 304 Hudson Street, New York, New
 4   York, on Friday, April 23, 2010, commencing at 9:07
 5   in the forenoon before PATRICIA MULLIGAN
 6   CARRUTHERS, a Certified Shorthand Reporter and
 7   Notary Public of the State of New Jersey and Notary
 8   Public of the State of New York.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   A P P E A R A N C E S:
 2
 3   COLUCCI & UMANS
 4   218 East 50th Street
 5   New York, New York  10022
 6   (212) 935-5700
 7   BY:  FRANK J. COLUCCI, ESQ.
 8        fcolucci@colucci-umans.com
 9        MICHAEL J. PAMPALONE, III, ESQ.
10        mpampalone@colucci-umans.com
11   Attorneys for the Plaintiff
12
13   RUSS AUGUST & KABAT
14   12424 Wilshire Boulevard
15   Los Angeles, California  90025
16   (310) 826-7474
17   BY:  LARRY C. RUSS, ESQ.
18        lruss@raklaw.com
19   Attorneys for the Defendants
20
21
22
23
24
25
```

Page 4

```
 1                    I N D E X
 2
 3   WITNESS                              PAGE
 4   RANDALL M. PYLES
 5   By Mr. Russ                         6, 88
 6   By Colucci                         86, 91
 7
 8
 9          REQUESTS FOR PRODUCTION
10          PAGE    LINE
11           29      18
12           41      25
13           44      10
14           50      16
15           52      15
16           53      13
17           55      20
18           63      23
19           65      15
20           66      18
21           68      14
22           85       4
23           89      20
24           91       5
25
```

Ex. 6

Randall M. Pyles
April 23, 2010

Express, LLC v.
Forever 21, Inc.

Page 45

1      Q.      Okay.  You would know if something
2  was introduced that looked just like this.  Right?
3      A.      Yes.
4      Q.      And you can't think of anything at
5  the moment?
6      A.      Not at the moment.
7      Q.      As the senior buyer at Express, do
8  you have anything to do with actually ordering the
9  merchandise that is sold by Express?
10     A.      That is -- I determine the
11 quantity.
12     Q.      You determine the quantity?
13     A.      Yes.
14     Q.      Do you deal with the manufacturers
15 or the manufacturer agents?
16     A.      No.
17     Q.      So you determine the quantity to
18 order for a particular item?
19     A.      Correct.
20     Q.      What do you base your
21 decision-making process on how many units to order
22 of a particular item?
23     A.      It could -- It can vary based upon
24 history, based upon test results, based upon
25 merchant intuition.

Page 46

1      Q.      When you say "test results," what
2  are you talking about?
3      A.      If I were to test a particular
4  style or color.
5      Q.      How do you test a particular style
6  or color?
7      A.      I could put a style or a color in
8  a number -- a small number of stores.
9      Q.      Was that done in connection with
10 Exhibit 77?
11     A.      No.
12     Q.      How did you decide how many units
13 to order of Exhibit 77?
14     A.      With that -- with regard to that
15 particular style, I probably looked at history
16 of -- of a similar or like item.
17     Q.      Other track jackets?
18     A.      Yes.
19     Q.      Was Exhibit 77 ordered once?
20     A.      Yes.
21     Q.      Was it ever reordered?
22     A.      No.
23     Q.      So you have nothing to do with the
24 actual purchase order of the item?
25     A.      No.

Page 47

1      Q.      So based upon your answer before
2  about how you came up with ordering the initial
3  quantity for Exhibit 77, basically, you ordered
4  roughly about the same number of units as you
5  ordered for other track jackets in the past?
6      A.      Yes.
7      Q.      Not significantly more or not
8  significantly less?
9      A.      With regards to that one, I don't
10 recall if it was significantly more or
11 significantly less.
12     Q.      What is the typical order?  When
13 you order track jackets, what is the typical first
14 order that you order for 550 stores?
15     A.      Depends on the time of year.
16     Q.      What time of year was this track
17 jacket ordered for?
18     A.      Spring.
19     Q.      Spring.  So what's the typical
20 order for spring?
21     A.      It could be 10,000 units.
22     Q.      If an item is really popular and
23 does really well, do you ever reorder it?
24     A.      Yes.
25     Q.      And if it continues to sell really

Page 48

1  well, you'll reorder it again.  Right?
2      A.      Maybe.
3      Q.      In other words, if an item sells
4  through your store well over and over and over
5  again, you'll just keep it in inventory as long as
6  it's selling well?
7      A.      Yes.
8      Q.      Are you generally knowledgeable
9  about the relative success of Express' track
10 jackets in relation to one another?
11     A.      Yes.
12     Q.      Since your last stint at Express
13 the last two years, what has been your most popular
14 track jacket?
15     A.      It was probably actually a couple
16 of years ago.  I don't recall the exact style.
17     Q.      But you have something in mind --
18     A.      Yes.
19     Q.      -- that was really popular.  And
20 how many units did it sell?
21     A.      I couldn't tell you right offhand.
22     Q.      More than 20,000 units?
23     A.      Probably.
24     Q.      More than 30,000 units?
25     A.      I don't think so.

Ex. 6
48

1  C E R T I F I C A T I O N

2

3       I, PATRICIA MULLIGAN CARRUTHERS, a

4  Certified Shorthand Reporter and Notary Public of

5  the State of New Jersey and a Notary Public of the

6  State of New York, do hereby certify that prior to

7  the commencement of the examination the witness was

8  sworn by me to testify as to the truth, the whole

9  truth, and nothing but the truth.

10      I do further certify that the foregoing is

11  a true and accurate transcript of the testimony as

12  taken stenographically by and before me at the

13  time, place, and on the date hereinbefore set

14  forth.

15      I do further certify that I am neither of

16  counsel nor attorney for any party in this action

17  and that I am not interested in the event nor

18  outcome of this litigation.

19

20  *Patricia M Carruthers*
    Patricia Mulligan Carruthers, CSR

21  Certificate No. XI00780
    Notary Public of the State of New York

22  Notary Public of the State of New Jersey

23  Dated:  May 10th, 2010

24

25  My commission expires October 23, 2010.   (N.J.)
    My commission expires October 04, 2009.   (N.Y.)

                      92

Ex. 6
49