Name _Frank J. Colucci, Esq._

Address _Colucci & Umans, 218 East 50th Street_

City, State, Zip _New York, New York 10022_

Phone _(212) 935-5700_

Fax _(212) 935-5728_

E-Mail _fcolucci@colucci-umans.com_

☐ FPD   ☐ Appointed   ☐ CJA   ☐ Pro Per   ☒ Retained

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

Express, LLC,

                                        PLAINTIFF(S),

                        v.

Forever 21, Inc.; Jin Sook Chang; Do Won Chang; White
Owl Clothing, Inc.; Steps Apparel Group, Inc., et al.,

                                        DEFENDANT(S).

CASE NUMBER:

2:09-cv-04514-ODW-VBK

**NOTICE OF APPEAL**

NOTICE IS HEREBY GIVEN that _____ Express, LLC _____ hereby appeals to
                                                    *Name of Appellant*
the United States Court of Appeals for the Ninth Circuit from:

**Criminal Matter**

☐ Conviction only [F.R.Cr.P. 32(j)(1)(A)]
☐ Conviction and Sentence
☐ Sentence Only (18 U.S.C. 3742)
☐ Pursuant to F.R.Cr.P. 32(j)(2)
☐ Interlocutory Appeals
☐ Sentence imposed:

☐ Bail status:

**Civil Matter**

☒ Order (specify):
Order Denying Plaintiff's Motion for
Summary Judgment, and Granting
                    Defendants', dated
☒ Judgment (specify):        9/2/10
Final Judgment, dated 9/16/10

☐ Other (specify):

Imposed or Filed on _Order, 9/2/10;_ . Entered on the docket in this action on _Order, 9/3/10;_ .
                     _Judgment, 9/16/10_                                      _Judgment, 9/20/10_
A copy of said judgment or order is attached hereto.

_9/30/10_

Date

*Frank J. Colucci*

Signature
☐ Appellant/ProSe   ☒ Counsel for Appellant   ☐ Deputy Clerk

**Note:**   The Notice of Appeal shall contain the names of all parties to the judgment or order and the names and addresses of the attorneys for each party. Also, if not electronically filed in a criminal case, the Clerk shall be furnished a sufficient number of copies of the Notice of Appeal to permit prompt compliance with the service requirements of FRAP 3(d).

United States District Court for the Central District of California

Western Division

File Number: 2:09-cv-04514-ODW-VBK

| | | |
|---|---|---|
| EXRESS, LLC, | ) | |
| | ) | |
| Plaintiff/Appellant | ) | |
| | ) | |
| v. | ) | |
| | ) | **NOTICE OF APPEAL** |
| FOREVER 21, INC., FOREVER 21 | ) | |
| LOGISTICS, LLC; FOREVER 21 | ) | |
| RETAIL, INC; JIN SOOK | ) | |
| CHANG; DO WON CHANG; | ) | |
| WHITE OWL CLOTHING, INC.; | ) | |
| STEPS APPAREL GROUP, INC., | ) | |
| | ) | |
| Defendants/Appellees. | ) | |
| | ) | |

Notice is hereby given that EXPRESS, LLC ("EXPRESS"), Plaintiff in the above names case, hereby appeals to the United States Court of Appeals for the Ninth Circuit from:

1.    The "Order Denying Plaintiff's Motion for Summary Judgment and Granting Defendants' [90, 93, 97]", entered in this action on the 3rd of September, 2010; and

2. The final judgment in favor of Defendants Forever 21, Inc.; Forever 21 Logistics, LLC; Forever 21 Retail, Inc.; Jin Sook Chang; Do Won Chang; White Owl Clothing, Inc.; and Steps Apparel Group, Inc., entered in this action on the 20th of September, 2010.

Dated: September 30, 2010

**COLUCCI & UMANS**

Frank J. Colucci
(*Admitted Pro Hac Vice*)
David M. Dahan
(*Admitted Pro Hac Vice*)
218 East 50th Street
New York, New York 10022
Tel: (212) 935-5700
Facsimile: (212) 935-5728
E-mail: fcolucci@colucci-umans.com

*Attorneys for Plaintiff/Appellant, Express, LLC*

# CERTIFICATE OF SERVICE

This is to certify that on September 30, 2010, a true and correct copy of the foregoing Notice of Appeal was served by United States Mail, first class, as well as by the notice of this filing automatically generated through this Court's Case Management and Electronic Case Filing (CM/ECF) system, on counsel of record for all parties to the action below in this matter, as follows:

**RUSS AUGUST & KABAT**
Larry Russ, Esq.
Nathan Meyer, Esq.
12424 Wilshire Boulevard, 12th Floor
Los Angeles, CA 90025
Tel: (310) 826-7474
Fax: (310) 826-6991
E-mails:      LRuss@raklaw.com
              NMeyer@raklaw.com
*Attorneys for Defendants Forever 21, Inc.,*
*Forever 21 Logistics, LLC; Forever 21 Retail, Inc.,*
*Jin Sook Chang; and Do Won Chang*

**LEVINSON, ARSHONSKY, & KURTZ, LLP**
Angie Lee, Esq.
15303 Ventura Blvd., #1650
Sherman Oaks, CA 91403
Tel: (818) 382-3434
Fax: (818) 382-3433
E-mail: alee@laklawyers.com
*Attorneys for Defendant Steps Apparel Group, Inc.*

**HOLLAND & KNIGHT**
Theresa Middlebrook, Esq.
633 W. Fifth Street, 21st Floor
Los Angeles, California 90071
Tel: (213) 896-2400
Fax: (213) 896-2450
E-mail: theresa.middlebrook@hklaw.com
*Attorneys for Defendant White Owl Clothing, Inc.*

Case 2:09-cv-04514-ODW-VBK   Document 175   Filed 09/30/10   Page 5 of 24   Page ID
Case 2:09-cv-04514-ODW-VBK   Document 166   Filed 09/02/10   Page 1 of 18   Page ID
#:3493

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| EXPRESS, LLC, | ) | CASE NO. CV 09-4514 ODW (VBKx) |
|         Plaintiff, | ) | |
| | ) | ORDER DENYING PLAINTIFF'S |
| vs. | ) | MOTION FOR SUMMARY |
| | ) | JUDGMENT AND GRANTING |
| FOREVER 21, INC., et al., | ) | DEFENDANTS' [90, 93, 97] |
| | ) | |
|         Defendants. | ) | |
| _____ | ) | |
| | ) | |

Currently before the Court is Defendant White Owl Clothing, Inc.'s ("White Owl")
motion for summary judgment (Docket No. 90), Defendants Forever 21, Inc., Forever 21
Logistics, Inc., Forever 21 Retail, Inc., Jin Sook Chang, Do Won Chang, (collectively
"Forever 21") and Steps Apparel Group, Inc.'s ("Steps") motion for summary judgment
(Docket No. 93), and Plaintiff Express Ltd.'s ("Express") motion for summary judgment
(Docket No. 97). After careful consideration of the briefing and evidence submitted in
support of and in opposition to these motions, White Owl's motion is **GRANTED**, Forever
21 and Step's motion is **GRANTED**, and Express's motion is **DENIED**.

## I. FACTUAL BACKGROUND

Express and Forever 21 are both clothing retailers with hundreds of locations
nationwide. *See* 1st Amend. Compl. ¶¶ 17, 19. This case involves five garments sold at
Forever 21 stores: four plaid men's shorts (the "Forever 21 Shorts") and one men's track
jacket (the "Forever 21 Jacket"). Plaintiff Express alleges that all five Forever 21 garments
are copies of garments designed and sold by Express, and brings claims for copyright

Case 2:09-cv-04514-ODW-VBK   Document 175   Filed 09/30/10   Page 6 of 24   Page ID
Case 2:09-cv-04514-ODW-VBK   Document 188   Filed 09/02/10   Page 2 of 18   Page ID
#:3494

1   infringement, trade dress infringement, and unfair competition.

2        A.    The Plaids

3        Express first brings a claim for infringement of its copyrights in four plaid designs

4   named "Bruin," "Jack," "Ocean," and "Roth" (collectively, the "Express Plaids" or

5   "Plaids") based on Forever 21's sale of the four plaid Forever 21 Shorts. 1st Amend.

6   Compl. ¶¶ 63-64. Defendant White Owl is the supplier of two of the Forever 21 Shorts,

7   the two accused of infringing the Ocean and Jack Plaid copyrights, respectively. Decl. of

8   Isaac Saul in Supp. of White Owl's Mot. Summ. J. ¶ 2. Defendant Steps is the supplier of

9   the other two Forever 21 Shorts, accused of infringing the Roth and Bruin Plaid copyrights,

10  respectively. Decl. of Key Chu in Supp. of Forever 21 & Steps's Mot. Summ. J. ¶ 2.

11  Express alleges that the plaid designs on the Forever 21 Shorts are essentially exact copies

12  of the Express Plaids.[1] *See, e.g.*, 1st Amend. Compl. ¶ 47.

13       Express designer Michael Tower, the alleged creator of the copyrighted Express

14  Plaids, gave detailed deposition testimony about the process by which he generated each

15  of the four Plaids. Decl. of Theresa W. Middlebrook in Opp'n to Express's Mot. Summ.

16  J., Exh. B; Decl. of Frank J. Colucci in Opp'n to Defendants' Mots. Summ. J., Exh. 5

17  (collectively, the "Tower Deposition").[2] Tower described the design process as follows:

18       A.    It's very easy actually. We start – This is how the process

19  works: We start. We come up with inspiration, whether it's a tear sheet,

20  whether it's a photograph, whether it's a garment. It can be any of those.

21  I basically get that. I start with that. I use it for inspiration. I like it. I

22  meet with my CAD designer. We talk about a couple of things, how we

23  want to reengineer it, redesign it, and basically, that's how the process

24

25  _____

26  [1]Steps admits that it had access to the Express Plaids, *see* Forever 21 & Steps's Br. in Supp.
    of Mot. Summ. J. 8; White Owl contends that it did not, *see* White Owl's Br. in Supp. of
27  Mot. Summ. J. 2-3.

28  [2]Both exhibits are excerpts from Tower's deposition.

Case 2:09-cv-04514-ODW-VBK   Document 175   Filed 09/30/10   Page 7 of 24   Page ID
Case 2:09-cv-04514-ODW-VBK   Document #:3495   Filed 09/02/10   Page 3 of 18   Page ID
#:3495

1  begins, basically.

2        Q.    *So in this case, you started out with pictures or swatches of*

3  *some plaids along with pictures of shorts. That was your original*

4  *concept before you went to go talk to the CAD designer?*

5        A.    *Yes.*

6        Q.    Okay. And then you would show the CAD designer the

7  swatches and photos or whatever you used for inspiration, you showed

8  that to the CAD designer?

9        A.    Yes.

10        Q.    And then you would collaborate with the CAD designer to

11  do what? What does the CAD designer do?

12        . . .

13        A.    He – He takes the pattern that I tell him, that I give him

14  instructions on, and he renders that for us.

15        Q.    *So he takes the pattern that you show him, and he basically*

16  *creates that on his CAD machine?*

17        A.    *Yes.*

18        Q.    Okay. And then what happens? He creates it on the CAD

19  machine. What does he do with it? He shows it to you?

20        . . .

21        A.    Yes.

22        Q.    Then what happens?

23        A.    *Then I take a look at it, and if I'm happy with it, I begin to*

24  *do colorups with it.*

25        Q.    What does that mean, to do colorups?

26        A.    Well, we have color stories for seasons.

27        . . .

28        A.    It means coloring – taking the CAD and putting colors into

Case 2:09-cv-04514-ODW-VBK   Document 175   Filed 09/30/10   Page 8 of 24   Page ID
Case 2:09-cv-04514-ODW-VBK   Document 138   Filed 09/02/10   Page 4 of 18   Page ID
#:3496

that CAD.

    Q.    . . . [T]he line that you're introducing during the course of this season are going to follow certain color patterns that you've selected for the season?

    A.    Yes.

Tower Deposition at 53-55 (emphasis added).

    Tower went on to confirm that he used this process to create each of the Plaids at issue in this case. For each of the four Plaids, Tower verified that the Plaid was based on a pre-existing design,[3] though he cannot remember precisely what design each Plaid was based on nor what he did or did not change when creating the Plaids from these original, pre-existing designs.

    Q.    In connection with [the Roth Plaid]. Do you remember what you showed the CAD designer, the CAD person, to create this particular plaid?

    A.    No.

    . . .

    Q.    But you do remember that you did show him something?

    A.    Yes.

    . . .

    Q.    Do you remember what specific changes you told [the CAD designer] to make from the original thing that you gave him, that you showed him?

---

[3] Tower testified that in the past he has obtained pre-existing plaid designs from "the national history museum, . . . . Lodges[, and] . . . . old libraries." Tower Deposition at 14-15. Some of Tower's testimony suggests that he may have also drawn inspiration from other sources. For example, Tower testified that, when working for previous employers on other garments, he has drawn inspiration from among other things "magazines[,] . . . . pictures[,] . . . . [k]ids wearing clothes[,] . . . . newspapers, any kind of media basically, . . . garments[,] . . . . Internet research[, and] . . . . stores." Tower Deposition at 17.

4

Case 2:09-cv-04514-ODW-VBK    Document 175    Filed 09/30/10    Page 9 of 24    Page ID
Case 2:09-cv-04514-ODW-VBK    Document 3883    Filed 09/02/10    Page 5 of 18    Page ID
#:3497
#:3497

1      . . .

2      A.      No.

3      Q.      So you don't remember any specific design changes that

4      you made.

5      A.      For this short, no.

6      Q.      I'm going to ask the same question for all of these shorts.

7      Let's start with [the Jack Plaid].  I'm assuming you went through the

8      same process.  You showed [the CAD designer] something.  You did a

9      rendering on the CAD.  You told him what you wanted changed.  Right?

10     A.      That's correct.

11     Q.      Do you remember with respect to [the Jack Plaid] what you

12     told him to change?

13     A.      No.

14     Q.      How about [the Ocean Plaid]?  You showed [the CAD

15     designer] something that he did a rendering on, and you told him to

16     change something.  Right?

17     A.      Yes.

18     Q.      Do you remember what you told him to change on [the

19     Ocean Plaid]?

20     A.      No.

21     Q.      How about [the Bruin Plaid]?  You showed [the CAD

22     designer] something.  You told him to do a rendering.  Right?

23     A.      Yes.

24     Q.      You told him to change something, correct?

25     A.      Yes.

26     Q.      Do you remember what you told him to change?

27     A.      No.

28     . . .

Case 2:09-cv-04514-ODW-VBK   Document 175   Filed 09/30/10   Page 10 of 24   Page ID
Case 2:09-cv-04514-ODW-VBK   Document 3684   Filed 09/02/10   Page 6 of 18   Page ID
#:3498

Q.     But in this case with respect to these four shorts I just showed you, you don't remember specifically what changes you made from the original items that you showed him?

A.     No.

Q.     And you also don't recall specifically where you got whatever it is that you showed him in connection with these four shorts?

A.     No.

Tower Deposition at 62-65.

Despite his inability to remember the basis for each Plaid, however, Tower was able to confirm that he did not provide the CAD designer with an original sketch of a plaid design; rather the Plaids were each based on a pre-existing design that may have been scanned into Express's CAD system.

Q.     Do you know whether [the CAD designer] had the ability to scan a photograph or scan whatever it is you gave him to start with something on the CAD device that he could play with?

A.     Yes.

Q.     How does he do that?

A.     He has a scanner.

.  .  .

Q.     So would it be fair to say in light of the description of how you came up with these shorts, that you didn't do any drawings from scratch that you gave to [the CAD designer] to translate into the CAD machine. Right?

.  .  .

Q.     It's correct that you did not give him any drawings from scratch?

A.     Yes. That is correct.

Case 2:09-cv-04514-ODW-VBK   Document 175   Filed 09/30/10   Page 11 of 24   Page ID
Case 2:09-cv-04514-ODW-VBK   Document 168   Filed 09/02/10   Page 7 of 18   Page ID
#:3499

1   Tower Deposition at 67-69.  Tower was also able to confirm that Express discarded the

2   pre-existing designs the Plaids were based upon.

3          Q.   . . . [D]oes anybody at Express have possession of whatever it is

4   that you showed to [the CAD designer] that he used to begin the process of

5   creating the CAD?

6          A.   Not to my knowledge.

7          Q.   So they would have been thrown away?

8          A.   We have a small space, so it's very hard to keep any kind of

9   things.  It's in Manhattan.

10   Tower Deposition at 75-76.

11   Express filed copyright registrations for each of the Plaids on June 10, 2009, Decl.

12   of Theresa W. Middlebrook in Supp. of White Owl's Mot. Summ. J., Exh. G, after Express

13   became aware of the Forever 21 Shorts on or about May 29, 2009, [Forever 21 SS of Facts

14   77, 81, 85, 89].  Express did not indicate in any of the four copyright applications that the

15   Plaids were created based upon pre-existing designs. Decl. of Theresa W. Middlebrook in

16   Supp. of White Owl's Mot. Summ. J., Exh. G.  Nor has Express subsequently amended any

17   of its registrations to disclose a source for any of the Plaids. [Forever 21 SS of Facts 35,

18   48, 61, 74].

19          B.   <u>The Jackets</u>

20   Express brings a second claim under the Lanham Act for trade dress infringement

21   based on Forever 21's sale of the Forever 21 Jacket.  1st Amend. Compl. ¶¶ 65-74.

22   Express also brings related claims for violation of California Business and Professional

23   Code § 17200 and for common law unfair competition.  *Id.* at ¶¶ 75-84.  According to

24   Express, the Forever 21 Jacket is a near exact copy of a similar jacket previously sold at

25   Express (the "Express Jacket").  *See, e.g., id.* at ¶ 54.  Express claims that it owns trade

26

27

28

Case 2:09-cv-04514-ODW-VBK   Document 175   Filed 09/30/10   Page 12 of 24   Page ID
Case 2:09-cv-04514-ODW-VBK   Document 186   Filed 09/02/10   Page 8 of 18   Page ID
#:3500

1    dress rights in the appearance of the Express Jacket.[4] *See, e.g., id.* at ¶¶ 50-52.  Defendant

2    Steps is also the supplier of the Forever 21 Jacket.[5]  Decl. of Key Chu in Supp. of Forever

3    21 & Steps's Mot. Summ. J. ¶ 2.

4          Express sold the Express Jacket from December 2008 to April 2009 – initially in

5    select stores and later at all 576 Express stores nationwide – eventually selling over 16,000

6    units and earning over $600,000 in sales during this time.[6]  Declaration of Frank J. Colucci

7    in Supp. of Express's Mot. Summ. J., Exh. 26.  Other garments Express carried during the

8    same period sold substantially more units.  *See* [Forever 21 SS of Facts 15, 17, 18].  For

9    example, a top selling pair of Express denim sold sixty times more units, [15] and Express

10   routinely orders hundreds of thousands of units of other garments [17].  Also, a plain

11   Express track jacket without the trade dress at issue in this case sold more than the Express

12   Jacket. [18].]  Express offered the jacket for sale on the Express website, with an attendant

13   photograph and a short description.  *See* [Forever 21 SS of Facts 7-8].

## II.  SUMMARY JUDGMENT STANDARD

15         Summary judgment is properly granted when no genuine issues of material fact

16   remain in dispute and, viewing the evidence in the light most favorable to the non-moving

17   party, the movant is clearly entitled to prevail as a matter of law.  FED. R. CIV. P. 56;

18   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The moving party bears the initial

19   burden of showing that there is no material factual dispute, and may meet this burden of

20   production by either of two methods:

21   _____

22   [4] Among others, Express argues that the Express Jacket has the follow distinctive elements:

23   "horizontal chest pocket zipper"; "'[p]assport stamp' emblem and lettering above the chest
     pocket"; "[d]ownward vertical, handwritten numbers and lettering outside the right hand

24   jacket pocket"; and "[s]titched satiny strips of varying widths accenting" various parts of

25   the jacket.  *See* Express's Br. in Supp. of Mot. Summ. J. 7.

26   [5] Again, Steps admits that it had access to the Express Jacket.  *See* Forever 21 & Steps's Br.

27   in Supp. of Mot. Summ. J. 8.

28   [6] Exact sales figures have been designated as "CONFIDENTIAL" in this case.

Case 2:09-cv-04514-ODW-VBK   Document 175   Filed 09/30/10   Page 13 of 24   Page ID
Case 2:09-cv-04514-ODW-VBK   Document 169   Filed 09/02/10   Page 9 of 18   Page ID
#:3501

1    The moving party may produce evidence negating an essential element of the

2    nonmoving party's case, or, after suitable discovery, the moving party may

3    show that the nonmoving party does not have enough evidence of an essential

4    element of its claim or defense to carry its ultimate burden of persuasion at

5    trial.

6    *Nissan Fire & Marine Ins. Co., v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000).

7    If the moving party meets its burden by showing an absence of evidence supporting

8    an essential element of a claim or defense, it is not required to produce evidence showing

9    the absence of a material fact on such issues, or to support its motion with evidence

10   negating the non-moving party's claim. *Id.*; *see also Lujan v. Nat'l Wildlife Fed'n*, 497

11   U.S. 871, 885 (1990); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991).

12   The burden then shifts to the non-moving party to produce "specific evidence, through

13   affidavits or admissible discovery material, to show that the dispute exists." *Bhan*, 929

14   F.2d at 1409.

15   If the moving party meets its burden by negating an essential element of the

16   non-moving party's claim or defense, it must produce affirmative evidence of such

17   negation. *Nissan*, 210 F.3d at 1105. The burden then shifts to the non-moving party to

18   produce specific evidence to show that a dispute of material fact exists. *Id.*

19   If the moving party does not meet its initial burden of production by either method,

20   the non-moving party is under no obligation to offer any evidence in support of its

21   opposition. *Id.* This is true even though the non-moving party bears the ultimate burden

22   of persuasion at trial. *Id.* at 1107.

23   ## II. DISCUSSION

24   For the reasons given below, the Court grants summary judgment in favor of

25   Defendants as to all of Express's claims.

26   ### A. Infringement of Express's Plaid Copyrights

27   First, the Court grants summary judgment in Defendants' favor as to Express's claim

28   of copyright infringement. The undisputed record establishes that Express cannot prove

9

Case 2:09-cv-04514-ODW-VBK   Document 175   Filed 09/30/10   Page 14 of 24   Page ID
Case 2:09-cv-04514-ODW-VBK   Document 168   Filed 09/02/10   Page 10 of 18   Page ID
#:3588
#:3502

1   that any of the Plaids incorporate sufficient original creativity to qualify for copyright
2   protection.

3        In order to prove a claim of copyright infringement, Express must establish "(1)
4   ownership of a valid copyright, and (2) copying of constituent elements of the work that
5   are original." *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  When
6   a copyrighted work is "based upon one or more preexisting works" it is known as a
7   "derivative work." 17 U.S.C. § 101. "The copyright in a . . . derivative work extends only
8   to the material contributed by the author of such work, as distinguished from the
9   preexisting material employed in the work, and does not imply any exclusive right in the
10   preexisting material." 17 U.S.C. § 103(b).  Further, changes to a preexisting work are
11   themselves only protected by copyright if they "possess[] at least some minimal degree of
12   creativity." *Feist*, 499 U.S. at 345.  Accordingly, to prevail on its claim of copyright
13   infringement, Express must prove that at least one of the Plaids possesses a sufficiently
14   creative alteration original to Express.

15        The undisputed record, however, establishes that Express cannot meet this burden.
16   Express designer Michael Tower clearly testified that: (1) Each of the four Plaids was
17   based on an identifiable preexisting plaid design that a CAD designer replicated on
18   Express's CAD system, *see, e.g.*, Tower Deposition at 53 ("Q. So in this case, you started
19   out with pictures or swatches of some plaids along with pictures of shorts.  That was your
20   original concept before you went to go talk to the CAD designer?  A. Yes."); (2) Tower
21   has no recollection of what the pre-existing designs looked like or in what medium they
22   were represented, *see, e.g.*, *id.* at 62 ("Q. In connection with [the Roth Plaid].  Do you
23   remember what you showed the CAD designer, the CAD person, to create this particular
24   plaid? A. No."), other than to confirm that they were not his original designs, *see, e.g.*, *id.*
25   at 69 ("Q. It's correct that you did not give him any drawings from scratch? A. Yes. That
26   is correct."); (3) Tower is unable to identify a single difference between any Plaid and its
27   source, *see, e.g.*, *id.* at 65 ("Q. But in this case with respect to these four shorts I just
28   showed you, you don't remember specifically what changes you made from the original

10

Case 2:09-cv-04514-ODW-VBK   Document 175   Filed 09/30/10   Page 15 of 24   Page ID
Case 2:09-cv-04514-ODW-VBK   Document 169   Filed 09/02/10   Page 11 of 18   Page ID
#:3503

1    items that you showed him?  A.  No."), other than his recollection that he "colored-up" the

2    Plaids with certain colors Express selected for its seasonal clothing line, *see, e.g., id.* at 54-

3    56; and (4) Express discarded and failed to keep any record of any of the pre-existing

4    designs Tower used as a basis for the Plaids, *see, e.g., id.* at 75 ("Q. . . . [D]oes anybody

5    at Express have possession of whatever it is that you showed to [the CAD designer] that

6    he used to begin the process of creating the CAD?  A.  Not to my knowledge.").  This

7    undisputed testimony establishes that each of Express's Plaids was derived from at least

8    one identifiable pre-existing source and, therefore, are derivative works.  Moreover, it

9    establishes that Express has no proof whatsoever that Express made any particular changes

10   to the source material, let alone changes that are sufficiently creative to warrant copyright

11   protection.[7]

12       At best, Tower was able to recall that he "colored-up" the Plaids with certain colors

13   Express selected for its seasonal clothing line.  Tower Deposition at 54-56.  However, as

14   Tower testified that he has no recollection of the original plaid designs, let alone

15   knowledge of how they were originally colored, Express cannot produce any evidence at

16   trial of what color substitutions Tower may have made.  Thus, the mere fact that Tower

17   claims he "colored-up" the Plaids does nothing to cure the utter lack of evidence upon

18   which a juror could reasonably conclude that any of the Plaids contains content original to

19

20   _____

21   [7]Express attempts to rehabilitate Tower's deposition testimony with an eleventh hour
     declaration from Tower submitted along with Express's reply brief in support of its own
22   motion for summary judgment.  To the extent this declaration contradicts Tower's
     deposition testimony, it cannot save Express from summary judgment.  *See Block v. City*
23   *of Los Angeles*, 253 F.3d 410, 419 n.2 (9th Cir. 2001) ("A party cannot create a genuine
     issue of material fact to survive summary judgment by contradicting his earlier version of
24   the facts.").  Further, the Court concludes it would be unfairly prejudicial to Defendants
     to allow Express to rely on this new evidence at such a late date.  *See Wallace v.*
25   *Countrywide Home Loans, Inc.*, No. 08-1463, 2009 WL 4349534, at *7 (C.D. Cal. Nov.
26   23, 2009) ("A district court may refuse to consider new evidence submitted for the first
     time in a reply if the evidence should have been presented with the opening brief."
27   (collecting cases so holding)).

28

Case 2:09-cv-04514-ODW-VBK   Document 175   Filed 09/30/10   Page 16 of 24   Page ID
Case 2:09-cv-04514-ODW-VBK   Document #:3690   Filed 09/02/10   Page 12 of 18   Page ID
#:3504

Express.  Unsupported by even a scintilla of supporting evidence, Tower's post hoc assumptions about what changes he might have made to the original designs are insufficient to avoid summary judgment.  *See McSherry v. City of Long Beach*, 584 F.3d 1129, 1138 (9th Cir. 2009) ("Summary judgment requires facts, not simply unsupported denials or rank speculation."); *Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir.1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment.").

In any event, even if Tower could recall that he made particular color substitutions, mere changes in color are generally not subject to copyright protection.  37 C.F.R. § 202.1 ("[E]xamples of works not subject to copyright [include] . . . mere variations of . . . color"); U.S. Copyright Office, Compendium II, Copyright Office Practices § 503.02(a) (1984) ("[M]ere coloration cannot support a copyright even though it may enhance the aesthetic appeal or commercial value of a work.  For example, it is not possible to copyright a new version of a textile design merely because the colors of red and blue appearing in the design have been replaced with green and yellow, respectively.").

Rather than seriously dispute the content of Tower's testimony, Express argues that the burden falls on Defendants to prove that the Plaid copyrights are invalid by, for example, producing "identical public domain plaids" because Express registered the Plaids with the Copyright Office and registered copyrights are presumed valid.  17 U.S.C. § 410(c) ("In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.").  However, as Defendants point out, Express failed to disclose in its copyright applications that the Plaids were based on pre-existing designs[8] and, further, has failed to amend its registrations during the course of this litigation.  The Court fails to see why it should give presumptive

---

[8]According to Tower, no one at Express even talked to him before filing copyright registrations for the Plaids that he designed.  *See* Tower Deposition at 49-50.

12

Case 2:09-cv-04514-ODW-VBK   Document 175   Filed 09/30/10   Page 17 of 24   Page ID
Case 2:09-cv-04514-ODW-VBK   Document 168   Filed 09/02/10   Page 13 of 18   Page ID
#:3505

1 effect to a copyright registration that contradicts the sworn testimony of the purported

2 creator of the copyrighted work.[9] *Cf. Masquerade Novelty, Inc. v. Unique Indus., Inc.*, 912

3 F.2d 663, 668 n.5 (3d Cir. 1990) ("It may be that the correct approach in situations where

4 there has been a material, but inadvertent omission, is to deprive the plaintiff of the benefits

5 of § 410(c) and to require him to establish the copyrightability of the articles he claims are

6 being infringed.").

7      In any event, the Court concludes that, even if Express's copyright registration are

8 entitled to presumptive effect, Defendants have rebutted that presumption by producing

9 Tower's deposition testimony. *See Folio Impressions, Inc. v. Byer Cal.*, 937 F.2d 759,

10 763-64 (2d Cir. 1991) (affirming district court's ruling that "the presumption [of validity

11 of the plaintiff's copyright was] rebutted" based on testimony "to the effect that . . . the

12 original creator of the Folio Rose [i.e., the work at issue], had copied the background of

13 Pattern # 1365 from an unspecified public domain source"); *Gibson Tex, Inc. v. Sears

14 Roebuck & Co.*, 11 F. Supp. 2d 439, 442 (S.D.N.Y. 1998) ("[T]he failure to alert the

15 Copyright Office to relationships between the work for which registration is sought and

16 prior works of others endangers the presumption of validity . . . . In the instant matter, the

17 Court finds that [the rightsholder's] failure to register the design as a derivative work rebuts

18 the presumption of the copyright's validity.").

19 _____

20 [9]Indeed, a number of courts have granted summary judgment against a copyright owner in

21 light of evidence that the owner failed to inform the Copyright Office that the work at issue
was derived from another pre-existing work. *See R. Ready Productions, Inc. v. Cantrell*,

22 85 F. Supp. 2d 672, 692 (S.D. Tex. 2000) (invalidating the asserted copyright where
"Plaintiffs failed to disclose in their registration application that there were pre-existing

23 mailers on which Plaintiffs' works were substantially based. . . . . [and] this was not an

24 inadvertent error"); *Russ Berrie & Co., Inc. v. Jerry Elsner Co., Inc.*, 482 F. Supp. 980, 988
(S.D.N.Y. 1980); *Vogue Ring Creations, Inc. v. Hardman*, 410 F. Supp. 609, 615-16

25 (D.R.I. 1976). However, as the Court holds that summary judgment in favor of Defendants

26 is appropriate due to Express's inability to carry its burden at trial, the Court need not

27 consider whether summary judgment is also appropriate in this case based on Express's
failure to inform the Copyright Office that the Plaids were based on pre-existing designs.

28

Case 2:09-cv-04514-ODW-VBK   Document 175   Filed 09/30/10   Page 18 of 24   Page ID
Case 2:09-cv-04514-ODW-VBK   Document 169-2   Filed 09/02/10   Page 14 of 18   Page ID
#:3506

1    Accordingly, because it is undisputed that each Plaid was derived from at least one

2  pre-existing source and Express cannot present any evidence distinguishing the Plaids from

3  their pre-existing source material, the Court grants summary judgment in favor of each

4  Defendant with respect to Express's claims for copyright infringement.

5    B. <u>Infringement of Express Jacket Trade Dress</u>

6    The Court next grants summary judgment in favor of Defendants as to Express's

7  claim of trade dress infringement. The undisputed record establishes that Express cannot

8  carry its ultimate burden of persuasion at trial because it cannot prove that the appearance

9  of the Express Jacket has secondary meaning.

10    "To state an infringement claim under § 43(a) [of the Lanham Act] – whether it be

11  a trademark claim or a trade dress claim – a plaintiff must meet three basic elements: (1)

12  distinctiveness, (2) nonfunctionality, and (3) likelihood of confusion." *Kendall-Jackson*

13  *Winery Ltd. v. E & J Gallo Winery*, 150 F.3d 1042, 1046-47 (9th Cir. 1998). "[A]

14  product's design is distinctive, and therefore protectable, only upon a showing of secondary

15  meaning." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 216 (2000). The

16  Ninth Circuit has defined secondary meaning as "the mental association by a substantial

17  segment of consumers and potential customers between the alleged [trade dress] and a

18  single source of the product." *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354

19  (9th Cir. 1985) (en banc) (internal quotation marks omitted); *Vision Sports, Inc. v. Melville*

20  *Corp.*, 888 F.2d 609, 615 (9th Cir. 1989) ("A plaintiff's trade dress acquires secondary

21  meaning when the purchasing public associates the dress with a particular source.").

22  Secondary meaning is not easily established: "proof of secondary meaning entails vigorous

23  evidentiary requirements." *Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC*, 259

24  F.3d 25, 43 (1st Cir. 2001). When determining whether this vigorous evidentiary standard

25  has been met, Courts generally divide evidence of secondary meaning into two categories:

26  direct and circumstantial. *See, e.g.*, *Continental Lab. Prods. v. Medax Int'l, Inc.*, 114 F.

27  Supp. 2d 992, 999 (S.D. Cal. 2000) ("A plaintiff may establish secondary meaning through

28  direct and circumstantial evidence.").

Case 2:09-cv-04514-ODW-VBK   Document 175   Filed 09/30/10   Page 19 of 24   Page ID
Case 2:09-cv-04514-ODW-VBK   Document 163   Filed 09/02/10   Page 15 of 18   Page ID
#:3507
#:3503
#:3507

1      Direct evidence in the form of "[a]n expert survey of purchasers typically provides

2   the most persuasive evidence of secondary meaning." *Walker & Zanger, Inc. v. Paragon*

3   *Indus., Inc.*, 549 F. Supp. 2d 1168, 1179 (N.D. Cal. 2007) (citing *Levi Strauss*, 778 F.2d

4   at 1358); *see also Vision Sports*, 888 F.2d at 615.  Here, Express chose not to conduct a

5   survey and, therefore, offers no direct evidence that the appearance of the Express Jacket

6   has attained secondary meaning.[10]  *See Yankee Candle*, 259 F.3d at 43 ("The only direct

7   evidence probative of secondary meaning is consumer surveys and testimony by individual

8   consumers.").

9      Accordingly, Express relies solely on circumstantial evidence of secondary meaning.

10   "A plaintiff may also establish secondary meaning through circumstantial evidence, such

11   as: exclusivity, manner, and length of use, amount and manner of advertising, amount of

12   sales and the number of customers, and plaintiff's established place in the market."

13   _____

14   [10]Thus, the only direct evidence in the record are the results of a survey conducted by
Forever 21 (the "Forever 21 Survey"). [Forever 21 SS of Facts 2].  When presented with

15   an open-ended question, only one in two-hundred respondents (or 0.5%) identified the
Express Jacket with Express, and not a single participant identified the Forever 21 Jacket

16   with Express.  *Id.*  Even when presented with multiple answer choices, only two out of

17   two-hundred survey respondents (or 1%) identified Express as the source of the Forever

18   21 Jacket.  *Id.*  Express objects to the Forever 21 Survey, principally on the grounds that
the survey sample did not precisely match the age distribution of Forever 21's customer

19   base.  *See* Express's Br. in Opp'n to Forever 21 & Steps's Mot. Summ. J. 16-18.  Courts,
however, have generally been reluctant to exclude survey evidence on the basis of

20   purported methodological errors, especially alleged errors in the selection of sample

21   demographics.  *See Walker & Zanger*, 549 F. Supp. 2d at 1179 ("The court agrees with
defendant that the limited survey population reduces its probative value, but the court

22   declines to rule the survey inadmissible."); *Icon Enters. Int'l, Inc. v. Am. Prods. Co.*, No.

23   CV 04-1240 SVW, 2004 WL 5644805, at *26 (C.D. Cal. Oct. 7, 2004) ("[C]ourts within
the Ninth Circuit are reluctant to exclude survey evidence on the basis of an overinclusive

24   or underinclusive target population . . . . [T]he selection of an inappropriate universe

25   generally affects the weight of the resulting survey data, not its admissibility . . . ." (internal
quotation marks omitted)).  Nevertheless, because the Court concludes that summary

26   judgment is proper in this case regardless of Forever 21's survey evidence, the Court

27   declines to reach the admissibility and probative weight of the Forever 21 Survey and

28   renders this decision without relying on that evidence.

15

Case 2:09-cv-04514-ODW-VBK   Document 175   Filed 09/30/10   Page 20 of 24   Page ID
Case 2:09-cv-04514-ODW-VBK   Document 160   Filed 09/02/10   Page 16 of 18   Page ID
#:3508
#:3694

1   *Continental Lab.*, 114 F. Supp. 2d at 1000. Express fares poorly in each category. First,

2   the undisputed record establishes that Express sold the Express Jacket for a period of less

3   than 5 months, the last few weeks of which the Jacket spent on the "sale" rack where it was

4   sold at a discount, [Forever 21 SS of Facts 12]]. Second, it is also undisputed that Express

5   made no efforts to individually advertise or promote the Express Jacket. At best, Express

6   has shown that, as with most of its other garments, Express passively promoted the jacket

7   by offering it for sale on the Express website. Finally, it is undisputed that Express sold

8   less than 17,000 Express Jackets nationwide, an amount substantially lower than the

9   numbers sold of many other Express garments. Over the same time period, a top selling

10  pair of Express denim sold *sixty times* more units, and Express routinely orders *hundreds*

11  *of thousands* of units of other garments. In fact, a plain Express track jacket – i.e., one

12  without the allegedly distinctive trade dress at issue in this case – was a better seller than

13  the Express Jacket. [Forever 21 SS of Facts 15, 17, 18]. Spread over Express's 500 plus

14  retail locations, Express sold just six or seven Express Jackets per store per month during

15  the time the jacket was offered for sale. This evidence is unavailing. Courts routinely

16  grant summary judgment against plaintiffs who produced evidence of much longer sales

17  periods, greater advertising exposure, and far more impressive sales figures. *See, e.g.*,

18  *Continental Lab.*, 114 F. Supp. 2d at 1000 (granting summary judgment for defendant

19  despite evidence of, inter alia, "$100,000 in advertising and promotional expenditures,"

20  "sales of approximately $10,000,000," and "exclusive use of [the allegedly protected]

21  design for several years").

22          Rather than tout its sales and advertising data, Express stresses again and again that

23  it has alleged that Forever 21 essentially copied the exact appearance of the Express Jacket.

24  While it is certainly true that evidence of copying is quite probative of secondary meaning,

25  *see Continental Lab.*, 114 F. Supp. 2d at 1000 ("Evidence of deliberate copying may, in

26  appropriate cases, support an inference of secondary meaning."), numerous cases

27  demonstrate that copying alone is far from sufficient to avoid summary judgment, *see*

28  *Walker & Zanger*, 549 F. Supp. 2d at 1181 ("Proof of deliberate copying is not

16

Case 2:09-cv-04514-ODW-VBK   Document 175   Filed 09/30/10   Page 21 of 24   Page ID
Case 2:09-cv-04514-ODW-VBK   Document 175   Filed 09/02/10   Page 17 of 18   Page ID
#:3695
#:3509

1   determinative [of secondary meaning], . . . as it does not necessarily establish that the

2   copying is intended to confuse customers and capitalize on recognition of the plaintiff's

3   product. Competitors may intentionally copy product features for a variety of reasons . .

4   . ." (citing *Fuddruckers, Inc. v. Doc's B R Others, Inc.*, 826 F.2d 837, 844-45 (9th Cir.

5   1987))). A review of case law further demonstrates that, even taking Express's allegations

6   of copying as true, Express has failed to marshal anywhere near the level of circumstantial

7   evidence required to defeat Defendants' motions for summary judgment. *See Yankee*

8   *Candle*, 259 F.3d at 44-45 (granting summary judgment against the plaintiff's claim of

9   trade dress infringement despite "evidence of intentional copying" and "substantial

10  evidence that the [allegedly protected] line of candles and corresponding display have been

11  in circulation since 1995, that [the plaintiff] spends significant resources advertising [the

12  candle] line, and that sales of [the] candles have been extremely successful"); *Walker &*

13  *Zanger*, 549 F. Supp. 2d at 1179-81 (granting summary judgment against the plaintiff's

14  claim of trade dress infringement despite the defendant's admission that "it took plaintiff's

15  tiles to China to have them copied," a survey finding a 25 to 36% recognition rate among

16  interior designers, and evidence that the plaintiff enjoyed a "five-year period of exclusive

17  use" of the design at issue before the alleged infringement began).

18       Express asks this court to find secondary meaning simply because the Express Jacket

19  was sold by Express, a large nationwide retailer with over 500 stores. Were the Court to

20  accept Express's evidence as sufficient, it would have to conclude in future cases that

21  virtually every garment Express sells has secondary meaning. Unfortunately for Express,

22  secondary meaning is not so lightly bestowed. *See Yankee Candle*, 259 F.3d at 44

23  ("Although evidence of the pervasiveness of the trade dress may support the conclusion

24  that a mark has acquired secondary meaning, it cannot stand alone. To find otherwise

25  would provide trade dress protection for any successful product, or for the packaging of

26  any successful product."); *Walker & Zanger*, 549 F. Supp. 2d at 1180 (rejecting the

27  plaintiff's contention that the court could find secondary meaning based solely on the sheer

28  "magnitude of plaintiff's advertising expenditures" because such a ruling "would extend

17

Case 2:09-cv-04514-ODW-VBK   Document 166   Filed 09/02/10   Page 18 of 18   Page ID
#:3510

1  trade dress protection to the design of every product with national marketing").

2  Accordingly, because the undisputed record establishes that Express cannot meet its burden

3  at trial of proving secondary meaning, the Court grants summary judgment in favor of each

4  Defendant as to Express's claim for trade dress infringement.

5      C. Remaining Claims

6      Finally, because the Court rejects Express's trade dress infringement claim, the Court

7  additionally grants summary judgment in favor of each Defendant with respect to Express's

8  remaining claims for unfair competition. *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63

9  (9th Cir. 2004) (affirming dismissal of unfair competition claims after affirming grant of

10  summary judgment to defendants on Lanham Act claim because "[t]his Circuit has

11  consistently held that state common law claims of unfair competition and actions pursuant

12  to California Business and Professions Code § 17200 are 'substantially congruent' to

13  claims made under the Lanham Act.").

14

15                              CONCLUSION

16      For the foregoing reasons, White Owl's motion for summary judgment is

17  **GRANTED**, Forever 21 and Steps' motion for summary judgment is **GRANTED**, and

18  Express's motion for summary judgment is **DENIED**. Defendants shall lodge a proposed

19  judgment forthwith.

20

21

22  **IT IS SO ORDERED**

23  DATED: September 2, 2010

24

25

26                              OTIS D. WRIGHT II
                                UNITED STATES DISTRICT JUDGE
27

28

Case 2:09-cv-04514-ODW-VBK   Document 175   Filed 09/30/10   Page 23 of 24   Page ID
#:3997
Case 2:09-cv-04514-ODW-VBK   Document 170   Filed 09/16/10   Page 1 of 2   Page ID #:3516

JS-6

```
            FILED
CLERK, U.S. DISTRICT COURT

       SEP 1 6 2010

CENTRAL DISTRICT OF CALIFORNIA
BY                      DEPUTY
```

1
2
3
4
5
6
7
8                  **UNITED STATES DISTRICT COURT**

9                  **CENTRAL DISTRICT OF CALIFORNIA**

10

11    EXPRESS LLC,                          Case No. CV09-04514 ODW (VBK)

12              Plaintiff,                   ~~[PROPOSED]~~ JUDGMENT

13         v.                               Complaint Filed:
                                                    June 23, 2009
14    FOREVER 21, INC.; FOREVER 21
      LOGISTICS, LLC; FOREVER 21            First Amended Complaint Filed:
15    RETAIL, INC.; JIN SOOK CHANG;                 December 4, 2009
      DO WON CHANG; WHITE OWL
16    CLOTHING, INC.; STEPS APPAREL
      GROUP, INC. dba STEPS OF CA; and
17    DOES 1 through 10, inclusive,

18              Defendants

19

20

21

22

23

24

25

26

27

28

RUSS, AUGUST & KABAT

2923-03 100908 Judgment.doc

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

In accordance with this Court's September 3, 2010 Order granting Defendants' motions for summary judgment, docket no. 168, which by this reference is incorporated as part of this Judgment as if set forth in full herein,

**IT IS ORDERED ADJUDGED AND DECREED** that Plaintiff Express LLC take nothing, that the action be adjudged on the merits, that final judgment is ENTERED in favor of all Defendants, Forever 21, Inc., Forever 21 Logistics, LLC, Forever 21 Retail, Inc., Do Won Chang, Jin Sook Chang, White Owl Clothing, Inc. and Steps Apparel Group, Inc. (collectively, "Defendants") against Plaintiff Express LLC, and that Defendants recover their costs.

Dated: 9/16/10

_____
Honorable Otis D. Wright

RUSS, AUGUST & KABAT

2923-03 100908 Judgment.doc

2
JUDGMENT